UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WOLVERINE WORLD WIDE, INC.,

     Plaintiff,

                                         Case No. 1:19-cv-10

v.

                                         HON. JANET T. NEFF

THE AMERICAN INSURANCE
COMPANY, et al.,

     Defendants.

_____/

## OPINION AND ORDER

This insurance dispute concerns Plaintiff Wolverine World Wide, Inc. ("Wolverine" or "insured") and certain Defendants[1]: Employers Insurance Company of Wausau ("Wausau"); Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of America ("Century"); and Travelers Indemnity Company ("Travelers") (collectively, "Defendants" or "insurers").[2]

---

[1] "'Defendants' as used herein means Defendants The American Insurance Company, Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America, Pacific Employers Insurance Company, Federal Insurance Company, First State Insurance Company, The North River Insurance Company, Liberty Mutual Insurance Company, The Travelers Indemnity Company, and Employers Insurance Company of Wausau as well as Counter-Claimants The Travelers Indemnity Company of Illinois n/k/a Travelers Property Casualty Company of America, Northfield Insurance Company, St. Paul Fire and Marine Insurance Company, The Aetna Casualty and Surety Company n/k/a Travelers Casualty and Surety Company and Travelers Property Casualty Company of America" (ECF No. 1171 at PageID.119609). The original motion for partial summary judgment (ECF No. 497 at PageID.11797) included Liberty Mutual as a Defendant. Liberty Mutual provided coverage to Wolverine until 1973 but was dismissed by stipulated order (ECF No. 588 at PageID.46343).

[2] Wolverine targeted the motion at the alleged breach of the duty to defend for those environmental and tort damage actions implicating the insurance coverage period 1971 to 1986 (ECF No. 498 at

In its motion, Wolverine alleges that it is entitled to summary judgment on the issue that Defendants-insurers breached their duties to defend, based on certain commercial general liability ("CGL") policies, 1971-1986, and the allegations in the underlying complaints that Wolverine caused environmental and tort damage as result of tannery waste groundwater contamination during this period (ECF No. 498 at PageID.11810-11815).[3]

On June 15, 2021, Special Master Manderfield issued "Opinion Granting Plaintiff's Motion for Partial Summary Judgment Regarding Certain Defendants' Breach of Defense Duties" (ECF No. 1106) (hereinafter "Report and Recommendation"). *See* Order, ECF No. 1109.  The Special Master's Report and Recommendation, recommended that the Court determine that there is no genuine issue of material fact that the insurers Wassau, Century, and Travelers (1) have an ongoing duty to defend Wolverine in the underlying tort and environmental damage actions; and (2) breached their duty to defend (*id.* at PageID.114896).[4]

Each of the Defendants-insurers filed an objection, and Wolverine responded to the objections.[5]

---

PageID.11810).  "Although these and other insurers also issued policies to Wolverine in other periods this motion is limited to the Policies issued from 1971 to 1986" (*id.*).
[3] Wolverine alleges that it brought this lawsuit in December 2018 "to obtain the contractual benefits under the policies it purchased" (ECF No. 1151 at PageID.117774-117775).
[4] The Special Master reserved the issue of the method for calculating defense cost allocation for a separate opinion (ECF No. 1106 at PageID.114895).  The Court agrees with the Special Master that the breach of the duty to defend and cost allocation are separate issues.  The Court's Opinion on the "Special Master's Report and Recommendation Regarding Defendant's Motion for Partial Summary Judgment on Allocation" (ECF No. 1161) is forthcoming.
[5] Insurers' objections: Travelers' Objection (ECF No. 1129), Century's Objection (ECF No. 1131), and Wassau's Objection (ECF No. 1133).  Wolverine's responses: Response to Travelers' Objection (ECF No. 1149), Response to Century's Objection (ECF No. 1155), and Response to Wassau's Objection (ECF No. 1151).  Each of the insurers filed a motion for leave to file a reply: Century's motion for leave to file a reply (ECF No. 1162) and Wolverine's response (ECF No. 1163); Travelers' motion for leave to file a reply (ECF No. 1170) and Wolverine's response (ECF No. 1174); Wassau's motion for leave to file a reply (ECF No. 1178) and Wolverine's response (ECF No. 1179).  The Court denied the motions as unwarranted (ECF No. 1194).

For the reasons that follow, the Court denies the objections and approves and adopts the Special Master's Report and Recommendation as the Opinion of the Court.

## I.  STANDARD OF REVIEW

The Court applies de novo review to the factual findings and legal conclusions of the Special Master to which the Defendants-insurers have raised specific objection.  *See* 28 U.S.C. § 636(b)(1)(B); FED. R. CIV. P. 53(f).  The Court "may adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions."  FED. R. CIV. P. 53(f)(1).

Summary judgment is proper where the movant shows there is no genuine issue as to any material fact, and "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  FED. R. CIV. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The Court views the facts and draws all reasonable inferences in favor of the non-moving party.  *Id.*  "Material facts are facts which are defined by substantive law and are necessary to apply the law. . . .  A dispute is genuine if a reasonable jury could return judgment for the non-moving party."  *Century Indem. Co. v. Aero-Motive Co.*, 318 F. Supp. 2d 530, 534 (W.D. Mich. 2003) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

## II.  ANALYSIS

The Special Master made three coordinate conclusions and findings: (1) under Michigan law, an insurer with a duty to defend must defend within a reasonable time after receiving notice of the duty to defend (ECF No. 1106 at PageID.114894, citing *Moore v. First Sec. Cas. Co.*, 568 N.W.2d 841, 845 (Mich. Ct. App. 1997)); (2) the insurers received notice of the duty to defend on January 8, 2018[6] (*id.* at PageID.114895); and (3) the insurers have not defended Wolverine in the

---

[6] The Court adopted the Special Master's Report and Recommendation (ECF No. 1050), establishing January 8, 2018 as the date the insurers received notice of the duty to defend (ECF No. 1147).

underlying actions and continue to be in breach of their duty to defend (*id.*).  The Court summarizes

the insurers' objections and Wolverine's responses to the Special Master's conclusions that are

properly before the Court.[7]

## A. The Parties' Arguments

Defendants-insurers object to the Special Master's conclusions on the grounds that the duty

to defend is a duty to pay a share of Wolverine's defense costs in the underlying actions (ECF No.

1129 at PageID.115822; ECF No. 1131 at PageID.116174).  In a case such as this, according to

the insurers, "span[ning] decades of alleged injury" and "impact[ing] multiple insurance policies

issued by several different insurers," each insurer has a duty to pay only a portion of Wolverine's

---

[7]  The Court will not address in this Opinion and Order the insurers' extensive briefing pertaining to the method of allocation of defense costs because the Special Master reserved this issue for a separate report and recommendation (ECF No. 1161).  Although the insurers argue that allocation is a predicate issue for determining the breach of the duty to defend and the determination of allocation of defense costs is dispositive of the present motion (ECF No. 1129 at PageID.115820, 115822)—"the issue of the duty to defend cannot be decided in [a] vacuum and cannot be properly decided without addressing allocation" (*id.* at PageID.115835)—the insurers cite no authority for this proposition.  The insurers attempt to convince the Court that the duty to defend is encompassed in the duty to pay defense costs (ECF No. 1131 at PageID.116147).  The duty to defend found in standard CGL policies is broader than and independent from the duty to pay defense costs and damage or indemnity costs. *St. Paul Fire & Marine Ins. Co. v. Mich. Mut. Ins. Co.*, 668 N.W.2d 903, 903 (Mich. 2003); *Stockdale v. Jamison*, 330 N.W.2d 389, 392 (Mich. 1982).  The duty to defend or provide the service of a defense lasts until such time as "the claims against the policyholder are confined to those theories outside the scope of coverage under the policy."  *Am. Bumper & Mfg. Co. v. Hartford Fire Ins. Co.*, 550 N.W.2d 475, 483 (Mich. 1996); *Bd. of Trustees of Michigan State Univ. v. Cont'l Cas. Co.*, 730 F. Supp. 1408, 1414 (W.D. Mich. 1990) (applying Michigan law) (quotations and citations omitted) ("Apportionment of defense costs is thus treated in the same way as allocation of damages, unlike the situation under a duty to defend policy, where the very notion of apportioning defense costs may be irrelevant since the insured has purchased litigation insurance with his premium.").

defense costs "related to property damage and/or bodily injury that takes place during the policy period of the insurer's policy" (ECF No. 1129 at PageID.115820, 115840).[8]

There are four strands to the insurers' argument.  First, the insurers oppose the conclusion that they were required to retain counsel to represent Wolverine, take control of the defense from Wolverine, and replace its selected counsel (*id.* at PageID.115824; ECF No. 1131 at PageID.116158).  Second, the insurers also maintain that Wolverine never asked them to do more than "participate" in the defense of the underlying actions, and they did this by agreeing to pay the pro rata, time-on-the-risk share of Wolverine's defense costs in accordance with governing law (ECF No. 1129 at PageID.115837; ECF No. 1131 at PageID.116146; ECF No. 1133 at PageID.116890).  Third, the insurers endeavor to show that they each acted reasonably upon receiving notice of the duty to defend and that their reasonableness, the timeliness of their responses to the insured, for example, should factor in the analysis of whether they breached the duty to defend.  The Court finds that the insurers misconstrue the duty to defend obligation.

Fourth, the insurers object that the allegations in the underlying actions fall within the pollution exclusion provided in their respective policies and that this exclusion obviates the need to defend (ECF No. 1133 at PageID.116899; ECF No. 1131 at PageID.116175).  The Court also finds that the Special Master correctly analyzed the applicability of the pollution exclusion to the allegations in the underlying actions.

The Court summarizes the unique points of insurers' objections and Wolverine's responses before analyzing the duty to defend and concluding that there is no issue of material fact and

---

[8]  The insurers propose that no one insurer is wholly responsible for Wolverine's defense and since, according to the insurers, no one insurer is responsible for providing a complete defense, the insurers are each only responsible for payment of their portion of the defense costs.  The insurers attempt to conflate the duty to defend and the duty to pay and collapse the one responsibility into the other.  As the Special Master correctly analyzed, the two are not synonymous.

Wolverine is entitled to summary judgment on the breach of the duty to defend.  Despite the significant space the parties devote in their briefing to objections and responses—over one hundred pages of argument from the insurers and over one hundred pages from the insured[9]—as discussed below, the Court finds that this is a narrow insurance contract dispute involving a standard duty-to-defend obligation.  The Court details the extensive argument by insurers (and Wolverine's response), who propose a contextual reading of the duty to defend.  For the reasons set forth in the discussion *infra*, the Court determines that the insurers have not shown how that duty was modified, excused, or should otherwise be avoided under standard contract principles.

*1. Travelers' Objections[10] and Wolverine's Responses*

*Strand One: Travelers' argument that it was not required to appoint counsel to appear in place of Wolverine's long-standing unilaterally selected counsel* (ECF No. 1129 at PageID.115836-115840).  Travelers objects that it was not required to replace Wolverine's counsel after it received notice of the duty to defend in January 2018, ten months after Wolverine retained counsel to prepare its defense (*id.* at PageID.115837).  Travelers argues that contrary to the Report and Recommendation it was not required to take control of Wolverine's defense and replace Wolverine's defense counsel because the policies at issue do not state that Travelers "can only

---

[9]  The Court limited future objections and responses to ten pages (ECF No. 1230).

[10]   Travelers states that the Report and Recommendation contains five errors: "Error No. 1: The Failure to Address Allocation;" "Error No. 2: The Failure to Address Collateral Estoppel;" "Error No. 3: The Holding that Travelers Was Required to Retain Defense Counsel to Replace Wolverine's Selected Counsel;" "Error No. 4: The Mischaracterization of the Content and Timing of Travelers Coverage Position Letters;" and "Error No. 5: The Failure to Apply Binding Michigan Case Law Regarding the Timing of Coverage Position Letters" (ECF No. 1129 at PageID.115822-115825).  Travelers also encourages the Court to undertake a de novo review of the entire record and track the parties' correspondence (*id.* at PageID.115829-115830).  The Court finds that a de novo review of the entire record is unnecessary to determine the issue of whether Travelers breached its duty to defend.

satisfy a defense duty by retaining counsel to file an appearance in place of the insured's selected defense counsel" (*id.* at PageID.115837-115839).

   *Strand Two and Three: Travelers' argument that it regularly and promptly corresponded with Wolverine regarding Wolverine's request that Travelers participate in Wolverine's defense and that Travelers' coverage position letters were timely as a matter of law* (*id.* at PageID.115841-115850).  According to Travelers, the Special Master failed to recognize the reasonableness of its behavior because Travelers fully and timely responded to each of Wolverine's notice letters, took a coverage position within a reasonable and timely manner, and agreed to Wolverine's wish to "participate" in the defense.[11]

   For example, Wolverine's May 2018 letter requested an insurance coverage determination and noted "that this letter is not a demand that Travelers take a position on the amount it [Travelers] may contribute to defense or indemnity, but merely a request that Travelers provide its position on whether it will participate in the defense.  Wolverine anticipates holding an in-person meeting with all participating primary insurance carriers in June 2018" (May 4, 2018 Request for Insurance Coverage Determination Letter, ECF No. 1129-13 at PageID.116047).  By June 2018, according to Travelers, Wolverine acknowledged Travelers' agreement to participate in the defense of the underlying actions (June 13, 2018, Coverage Decisions, ECF No. 1129-19 at PageID.116111).[12]

---

[11]   Travelers maintains that the Report and Recommendation faulted Travelers for doing what Wolverine requested of it: participating in Wolverine's defense, as Wolverine expressed that it "is currently working with its long-time attorneys, Warner Norcross & Judd, in actively defending the PFAS lawsuits" (*id.* at PageID.115842, citing January 8, 2018 Letter from Wolverine to Carriers, ECF No. 1129-8 at PageID.116030).

[12]   "Wolverine anticipates holding an in-person meeting as soon as possible with all participating primary insurance carriers to answer questions regarding the claims, address defense strategy, and further coordination and interim cost sharing" (ECF No. 1129-19 at PageID.116112).

Since Travelers "agreed to participate in Wolverine's defense of all but four of the approximately 290 lawsuits filed against Wolverine, and it did so within the timeframe recognized as reasonable as a matter of law under binding Michigan authority," taking four or five months to state its coverage position, Travelers asserts that the Special Master should have found its conduct reasonable and/or that a genuine issue of material fact exists as to the breach of its duty to defend (ECF No. 1129 at PageID.115845-115847).[13]  Travelers requests that the Court reject the Special Master's conclusion regarding its defense duties and deny the motion for partial summary judgment (*id.* at PageID.115850-115851).

Wolverine responds that Travelers has an ongoing duty to provide an actual defense, and it has failed to honor that duty in breach of the policies (ECF No. 1149 at PageID.116959). According to Wolverine, the issue presently before this Court involves "primary insurers' breach of their duty to render a service—i.e., defending Wolverine from hundreds of Underlying Actions—based on the duty to defend in the primary policies, which read: 'the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage'" (*id.* at PageID.116978).

Wolverine points to a July 25, 2018 letter from Travelers, seven months after Wolverine first provided notice of the duty to defend, which Wolverine states embodies Travelers' position on its defense duties (*id.* at PageID.116954-116955).  Wolverine quotes Travelers as stating that Travelers "reserve[s] all our [sic] rights and defenses in these matters" and that "5.5% is the

---

[13]  Travelers cites the following cases (ECF No. 1129 at PageID.115847) for the proposition that a reservation of rights letter sent four or five months after the initiation of the underlying action was timely or reasonable and that the Report and Recommendation failed to recognize the binding nature of Michigan case law: *Fire Ins. Exch. v. Fox*, 423 N.W.2d 325, 327 (Mich. Ct. App. 1988); *Allstate Ins. Co. v. Harris*, No. 215264, 2001 WL 672596, *2 (Mich. Ct. App. Apr. 24, 2001); *Amerisure Mut. Ins. Co. v. Carey Transp., Inc*., 578 F. Supp.2d 888 (W.D. Mich. 2008).  Travelers admits throughout its brief that it has not and is not defending Wolverine in the underlying actions.

allocated share we [sic] [Travelers] are prepared to contribute towards the reasonable and necessary defense-related counsel fees and expenses incurred by Wolverine in these matters pursuant to our May 25, June 4, and June 8, 2018 letters" (*id.* at PageID.116955; July 25, 2018 Letter Regarding Underlying Actions, ECF No. 558-13 at PageID.44932).

For Wolverine, the Special Master reached the appropriate conclusion because the duty to defend "requires an insurer to provide its insured with an actual defense—*i.e.*, to hire defense counsel—not merely reimburse its insured for a tiny fraction of defense costs" (ECF No. 1149 at PageID.116960).  Wolverine emphasizes that the duty to defend is broader than the duty to pay defense costs; it obligates the insurer to provide a service, marshal its resources; and this duty, cannot be allocated or apportioned (*id.* at PageID.116961, citing *Ray Indus., Inc. v. Liberty Mutual Ins. Co.*, 974 F.2d 754, 770-71 (6th Cir. 1992)).

For Wolverine, the value of a commercial general liability policy is the promise to defend an insured in the event of litigation (*id.* at PageID.116962, 116969, citing *Bd. of Trustees of Michigan State Univ.*, 730 F. Supp. at 1414; *Auto Club Ins. Ass'n v. Williams*, 446 N.W.2d 321, 323 (Mich. Ct. App. 1989)).  Properly understood, the policies at issue, are litigation insurance policies (*id.*, citing *Allstate Ins. Co. v. Freeman*, 443 N.W.2d 734, 756 n.3 (Mich. 1989)).  Thus, an insurer cannot participate in the defense merely by paying money (*id.* at PageID.116968, 116975).  Wolverine maintains that the Special Master correctly found that Travelers breached its duty to defend because Travelers has not provided the contractual service of a defense (*id.* at PageID.116966, 116970, 116972).

*2. Century's Objection and Wolverine's Response*

*Strand One to Three: Century's argument that the Special Master erred in recommending that Wolverine satisfied Fed. R. Civ. P. 56 and is entitled to summary judgment* (ECF No. 1131 at

PageID.116155-116174).  Century states that the Special Master "improperly resolved several issues of material fact" and takes issue with the Special Master's conclusion that Century "breached its contracts as a matter of law" because Century did not "hir[e] an attorney for Wolverine, have that attorney file an appearance for Wolverine and arrange to execute a substitution of attorneys as necessary" (*id.* at PageID.116158, quoting ECF No. 1106 at PageID.114894).  Century objects to the conclusion as inconsistent with the record evidence: "(1) that Wolverine had its own counsel in place for many months before giving Century notice of the Underlying Environmental Actions; (2) that Wolverine never asked Century to retain counsel for Wolverine; and (3) that Wolverine did not want Century to replace the defense team Wolverine put in place before giving notice of claims to Century, but instead wanted Century to 'share' in the costs of its defense team" (ECF No. 1131 at PageID.116158).

Century states that it understood that "Wolverine did not want the Insurers to take control of its defense, but merely wanted them to 'share' defense costs" because Wolverine was "the entity that selected and retained defense counsel and controlled the defense from the first threat of litigation through the inception of actual lawsuits . . . [and] introduced the concept of the Insurers' 'participation' in Wolverine's on-going defense" (*id.* at PageID.116160).

Specifically, Century argues that Wolverine did not meet its burden to establish that there were no genuine issues of material fact because there is a factual dispute as to whether Century agreed to do what Wolverine requested of it, namely, "participate in the defense" and share in the defense costs (ECF No. 1131 at PageID.116145-116146, 116156).  As Wolverine requested, Century "attended a meeting in which the defense team Wolverine assembled outlined the PFAS claims and the defense strategy they had developed" (*id.* at PageID.116146).  At the meeting,

according to Century, Wolverine informed Century of its defense costs and asked Century to share in these costs (*id.*).

It is telling in this regard, says Century, that Wolverine invited Century and the other insurers to a meeting to discuss an "interim cost sharing agreement" (*id.*).  At the meeting on July 26, 2018, Century maintains, Wolverine confirmed its request that the insurers share in the cost of the defense, discussed establishing a process for sharing and submitting invoices from its attorneys to implement the interim cost sharing arrangement, and introduced to the insurers the defense team it assembled of Warner Norcross and Judd and Arnold and Porter attorneys (*id.* at PageID.116161).[14]

According to Century, the Special Master, therefore, erred in applying the summary judgment standard because the Special Master failed to view the evidence in the light most favorable to the non-moving party, Century, in deciding the meaning of "participation" in this context (*id.* at PageID.116167-116169, 116171-116172).  At a minimum, Century offers that "there is an issue of fact as to the effect of Wolverine's request that Century 'participate' in its defense," since the "controlling law in Michigan is that each insurer with a duty to defend has a duty to participate, *i.e.*, to pay a *pro rata* share based on the policy periods" (*id.* at PageID.116172, 116174).

---

[14]  Century quotes Wolverine's in-house counsel Bradley Lorden in support of the claim that the objective of the meeting was the creation of an interim cost sharing plan (ECF No. 1131 at PageID.116164, citing Coffey Aff., ECF No. 615-1 at PageID.47143).  Century also states that another purpose of the meeting was to address the scope of participation (ECF No. 1131 at PageID.116164).  According to Century, Wolverine did not reverse course until October 12, 2018, when it requested a "complete defense," even though Century's counsel had been in place for months, and Wolverine never expressed a desire for Century to appoint defense counsel (*id.* at PageID.116162-116163).

*Strand Four: Century's argument that the Special Master erred in recommending that Century has a duty to defend all the underlying environmental actions despite the policies' broad pollution exclusion* (*id.* at PageID.116175-116180).  Century contends that contrary to the Special Master's conclusion the broad pollution exclusion in its insurance policies bars Wolverine's claim for defense based on the allegations in the underlying environmental actions (*id.* at PageID.116147-116148).   According to Century, it is undisputed that the underlying environmental actions arise out of Wolverine's alleged pollution discharges, and Wolverine makes no claim to rebut the fact that the underlying environmental actions are pollution-related claims. Therefore, according to Century, there is no dispute that the broad pollution exclusion is triggered (*id.* at PageID.116175).

Century summarizes the complaints as alleging that Wolverine "is liable for its long-term direct and intentional dumping and discharge of chemical-laden wastes at various locations," and argues that it is Wolverine's burden to establish the exception to the pollution exclusion for sudden and accidental discharges (*id.* at PageID.116175, 116178-116179, citing *Fireman's Fund Ins. Cos. v. Ex-Cell-O Corp.*, 702 F. Supp. 1317, 1328-29 (E.D. Mich. 1988); *Polkow v. Citizens Ins. Co.*, 476 N.W. 2d 382, 390 n. 5 (Mich. 1991)).

Specifically, the complaints in the underlying actions, according to Century, "all alleged that the waste seeped, leached and/or migrated into soils and groundwater causing property damage and bodily injury" (*id.* at PageID.116176).  As a result, Century argues that the detailed allegations in the complaints make clear that the Special Master's conclusion "that the underlying complaints 'are silent, uncertain, and or unclear as to whether any of the alleged polluting events were 'sudden or accidental' or 'unexpected or unintended,' . . . is plainly wrong and cannot be adopted" (*id.* at PageID.116178, quoting ECF No. 1106 at PageID.114876).

Century also maintains that the Special Master erred in characterizing the pollution exclusion as a narrow exclusion (ECF No. 1131 at PageID.116179).  Rather a "pollution exclusion broadly excludes coverage for all pollution-related liabilities, and applies in the first instance to exclude coverage for any and all claims alleging discharges, dispersals, releases or escapes of pollutants," and it is the exception to the exclusion for "sudden and accidental" releases of pollutants that is interpreted narrowly (*id.*).  For these reasons, according to Century, the conclusions in the Special Master's Report and Recommendation should not be adopted.

Wolverine responds that there are no issues of material fact to resolve because the breach of the duty to defend issue can be assessed as a pure question of law (ECF No. 1155 at PageID.118598).  For Wolverine, the Special Master correctly performed the task of resolving "the purely legal question of what the word 'defend' means" (*id.* at PageID.188597).  The undisputed fact here is that Century and the other insurers have not actually defended Wolverine at any time in the underlying actions thus the recommendation of summary judgment on the breach of the duty to defend was appropriate, Wolverine maintains (*id.*).

Wolverine also maintains that Century's argument that the Special Master did not draw all inferences from the parties' correspondence in Century's favor ignores the question of law that the Special Master decided (*id.* at PageID.118619-118620).  For Wolverine, Michigan law does not incentivize insurers to commit to a "calculated financial decision to breach their contracts" by sitting back and hoping to reimburse the pro rata share of defense costs (*id.*).

Wolverine emphasizes that the Special Master arrived at the correct conclusion that the later notice letters in mid-2018, requesting a response from insurers on whether they will participate in the defense, did not excuse Century's contractual duty to provide a defense (*id.* at PageID.118625).  The standard Century puts forward of whether Century "acted reasonably given

the context" or in a "reasonable time" is not the standard the Court must follow, Wolverine adds

(*id.* at PageID.118626).  The question the Court must determine is a contract and legal one (*id.*).

Wolverine states that it paid insurance premiums for a "full defense"[15] and the distinction

the insurer encourages is false because the policy Wolverine purchased does not state that Century

"will merely 'participate' by paying money to the insured on a pro rata basis to reimburse defense

costs" (*id.* at PageID.118612, 118614).  Wolverine declares that determining whether Century

"participated" or otherwise "abandoned" Wolverine is irrelevant to the summary judgment issue

(*id.*).  Thus, according to Wolverine, the insurers "wrongly argue that the standard for determining

whether there has been a breach of the duty to defend involves a factual and legal analysis of

whether the Insurers 'abandoned' Wolverine" (*id.* at PageID.118620).  Rather, Wolverine argues

that the Special Master determined the correct issue that "there is no genuine issue of any material

fact and Defendants have failed to defend Wolverine and are in breach of the insurance policies"

(*id.* at PageID.11861, quoting ECF No. 1106 at PageID.114894-114895).

Wolverine also counters that it is false that Century's duties "were somehow amended,

reformed, or altered" through the parties' correspondence (ECF No. 1155 at PageID.118623-

118624).  According to Wolverine, the insurers do not and cannot point to any case law to support

their position, particularly where the insurer Century admits that it has been providing the service

of a defense for its policyholders for years in similar contexts to the present one (*id.* at

PageID.118624).[16]

---

[15]  Wolverine specifically argues that the marshalling of the insurer's resources, the contractual
service of a defense, is especially important here involving "numerous, highly complex cases that
bore the potential for substantial expenses and liability" (ECF No. 1155 at PageID.118617).

[16]  Wolverine states that the Special Master found that Century is familiar with the context of this
case and what is required of it because Century has a "long history of handling environmental
claims filed in multi-party litigation similar to the present litigation" and that "Century has years
of experience defending its policyholders against claims Wolverine faces and has identified

Wolverine further argues that the Special Master properly considered and rejected the application of any pollution exclusion at this stage (*id.* at PageID.118621-118623). Wolverine states that it is Century that did not carry its burden of establishing that the pollution exclusion applied (*id.* at PageID.118621-118622).  At this stage, Wolverine opines, the insurers "cannot carry their burden to definitively establish that all the allegations in the complaints in the Underlying Actions fall unequivocally into a pollution exclusion and not outside such exclusions" (*id.* at PageID.118622).  According to Wolverine, the Special Master concluded only that coverage is possible based on the allegations in the complaints of the underlying actions, which is sufficient at this stage (*id.* at PageID.118623).  Further, under Michigan law, Wolverine contends that pollution exclusions are interpreted narrowly and against the insurer (*id.* at PageID.118623, quoting *Fire Ins. Exch. v. Diehl,* 545 N.W.2d 602, 606 (Mich. 1996)).  Thus, Wolverine responds that the Special Master's conclusion should be adopted.

*3. Wassau's Objection[17] and Wolverine's Response*

---

leading, national counsel with substantial experience litigating groundwater cases, that can defend Wolverine against the underlying claims" (*id.* at PageID.118624-118625, quoting ECF No. 1106 at PageID.114882).

[17]  Wassau states that the Special Master's Report and Recommendation contains the following errors: "First and most fundamentally, the Special Master reaches the conclusion that Wassau was in breach of its obligation to defend without any consideration of the issue of allocation;" "[s]econd, and relatedly, the Special Master ignored the argument of Wassau and other insurers that a pro-rata time-on-the-risk allocation was binding upon Wolverine based on collateral estoppel;" "[t]hird, the Special Master reached the conclusion that Wassau had a duty to defend each and every one of the hundreds of Complaints in the Underlying Actions . . . based on nothing more, than at most, a two-sentence summary description of the allegations," including a failure to consider the pollution exclusion; "[f]ourth, the Special Master's conclusion that Wassau was in breach of its contractual obligations by failing to appoint defense counsel to substitute for defense counsel appointed by Wolverine is wholly without foundation and erroneous;" fifth, the Special Master erroneously concluded that Wassau's defense obligations with respect to the underlying actions were triggered when Wolverine's outside counsel tendered certain lawsuits to Liberty Mutual on January 8, 2018; "[s]ixth, the Report and Recommendation does not accurately characterize the conduct of Nationwide in handling the subject claims on behalf of Wausau;" "[s]eventh, the Report and Recommendation fails to consider the impact of Wolverine's conduct;"

Strand One to Three: Wassau's argument that the Special Master's ruling that Wassau was in breach of its contractual obligations to defend by failing to appoint defense counsel to substitute for defense counsel appointed by Wolverine is wholly without foundation and erroneous (ECF No. 1133 at PageID.116900-116904). Wassau opines that there is no basis in the law and the policies for the conclusion that Wassau breached its defense obligations by failing to appoint defense counsel for Wolverine, and Wolverine "always sought to have complete control" over its defense (id. at PageID.116901, 116903).[18] Furthermore, according to Wassau, the Special Master's conclusion that Wassau failed to assist with the defense is contrary to factual record, since Wassau repeatedly offered Wolverine assistance with retaining defense counsel, which Wolverine ignored or resisted (id. at PageID.116902). In fact, Wassau provides that it "repeatedly offered to assist Wolverine in retaining competent defense counsel at reasonable rates and repeatedly submitted its billing guidelines" (id. at PageID.116917).[19] Moreover, Wassau maintains that it did not breach its defense obligations because it timely conveyed its coverage position in June 2018 (id. at PageID.116922-116923).

_____

eighth, the Report and Recommendation misstates Michigan law regarding the timeliness of Wassau's coverage letters (ECF No. 1133 at PageID.116887-116893).

[18] Wassau states that it is significant that Wolverine maintained a consistent front throughout the litigation by informing the insurer that it was working with its long-standing defense counsel Warner, Norcross and Judd; Wolverine then later hired additional defense counsel Quinn Emanuel and Hollingsworth LLP firms "without any prior notice to Wausau or any other insurer" (id. at PageID.116901).

[19] As part of Wassau's argument that the Special Master failed to consider the impact of Wolverine's conduct on whether Wassau breached its defense obligations, Wassau states that since it equates the duty to defend with the duty to pay defense costs "the Report and Recommendation does not assign any significance" to the fact that "Wolverine did not provide defense cost invoices which were not wholly redacted until December 2019" and thus "any obligation on the part of Wausau could not arise until after the billing invoices were produced without total redactions" (id. at PageID.116920).

*Strand Four*.  Finally, Wassau objects that the Special Master reached the conclusion that Wassau had a duty to defend each of the hundreds of lawsuits based on a cursory review and short summary description of the different allegations in the many complaints without properly considering the pollution exclusion (*id.* at PageID.116889, 116898-116899).

Wolverine responds that the Special Master correctly held that Wausau and the other insurers are in breach because they failed to provide Wolverine with the benefit of the service it purchased, an actual and full defense for the entire suit, leaving Wolverine to craft its own defense strategy and shoulder the costs of defending against hundreds of underlying actions (ECF No. 1151 at PageID.117783-117774).[20]  Wolverine reinforces that the duty to defend cannot be disposed of by mere payment of defense costs at some later stage of the litigation (*id.* at PageID.117796).

Wolverine asserts that the Special Master correctly found that consistent with Michigan law the allegations in each underlying action *potentially* covered property damage, bodily injury, and/or personal injury, as those terms are defined by the policies (*id.* at PageID.117775).  Under Michigan law the insurer bears the burden of showing that a lawsuit tendered for coverage does not trigger its duty to defend and "where the allegations potentially state a claim that arguably is

---

[20]  Wolverine provides the following chronology on Wassau's evolving position throughout this litigation: "As the Special Master noted, at the time Wolverine filed the present action, Wausau had agreed to 'participate' in paying a pro rata portion towards the defense of only six of the Underlying Actions: the MDEQ Action, the EPA Action, the Johns and Zimmerman class actions, and two of the Individual Actions. . . . Further, '[f]rom January to May 2019, Wausau declined to change its coverage position or to pay [Wolverine's defense cost] invoices.' . . . Many months later, Wausau and the other Insurers conceded that for some of the other Underlying Actions there was potential coverage and that they owed a duty to defend. . . .  But even then, Wausau (and the other Insurers) did not actually defend Wolverine but instead only agreed [sic] 'participate' in paying a tiny fraction of Wolverine's defense costs in only some of the suits, rather than providing Wolverine with the actual defense to which it was and is contractually and legally entitled" (ECF No. 1151 at 117775, quoting and citing, ECF No. 1106 at PageID.114883-114885, 114887).

covered by the policy, the insurer must defend" (*id.* at PageID.117776, quoting *Cincinnati Ins. Co. v. Zen Design Grp., Ltd.,* 329 F.3d 546, 553 (6th Cir. 2003)).

Here, Wassau, according to Wolverine, tried to control what it would defend by "participating" in Wolverine's defense and tardily reimbursing a small fraction of Wolverine's defense costs in amounts unilaterally determined by it (*id.* at PageID.117775).   Thus, for Wolverine, Wassau should be liable for all foreseeable damage flowing from the breach (*id.* at PageID.117797).

**B. Discussion**

The duty to defend is broader in scope and distinct from the duty to pay or indemnify. *Hastings Mut. Ins. Co. v. Mosher Dolan Cataldo & Kelly, Inc.*, 856 N.W.2d 550, 550 (Mich. 2014) (citing *American Bumper and Mfg. Co.*, 550 N.W.2d at 481).[21]   A duty to defend policy and its attendant premiums comprise a litigation insurance policy for the provision of legal services.  *See, e.g.*, *Bd. of Trustees of Michigan State Univ.*, 730 F. Supp. at 1414 (applying Michigan law); *Auto Club Ins.* Ass'n, 446 N.W.2d at 323.   There are two options

> available to an insurer when it is asked to defend an action brought against the insured.  It can undertake the defense with notice to the insured that it is reserving the right to challenge its liability on the policy. The second alternative for the insurer is to repudiate liability, refuse to defend and take its chances that there will be a showing that there is no coverage for the insured's liability.

*Detroit Edison Co. v. Michigan Mut. Ins. Co.*, 301 N.W.2d 832, 836 (Mich. Ct. App. 1981).  Under the second option, the failure to undertake a defense is a breach of the policy. *Elliott v. Cas. Ass'n of Am.*, 236 N.W. 782, 783 (Mich. 1931); *Zurich Ins. Co. v. Rombough*, 180 N.W.2d 775, 778

---

[21]   "An insurer's duty to defend is not only broader than its duty to indemnify, but is also an obligation to provide services (legal representation) to the insured. . . . A contrary result would essentially turn an insurer's defense obligation into a duty to reimburse, without affording the insurer the opportunity to control the defense and settlement of the underlying obligation." *Century Indem. Co.*, 318 F. Supp. 2d 530, 543-44 (W.D. Mich. 2003) (applying Michigan law).

(Mich. 1970). "Upon notice, there is some burden on the insurer to act to protect its interests or those of its insured.  The insurance carrier will not be permitted to benefit by sitting idly by, knowing of the litigation, and watching its insured become prejudiced."  *Alyas v. Gillard*, 446 N.W.2d 610, 613 (Mich. Ct. App. 1989).

The Court finds that the insurers essentially make two objections to the Special Master's Report and Recommendation: (1) the duty to defend does not apply to the underlying actions because of the pollution exclusion in the policies; and (2) insurers have honored their duty to defend the underlying actions in this context because they responded to Wolverine's request to participate in the defense within a reasonable time and they have paid and/or are paying their share of the defense costs according to Wolverine's wishes.  Insurers argue that because the Special Master's conclusion was wrong on both these issues, and because there is a genuine issue of material fact whether the insurers breached their duty to defend through their reasonable conduct under circumstances, summary judgment is precluded.

*1. Whether the Duty to Defend Applies to the Allegations in the Underlying Allegations Based on the Pollution Exclusion*

According to the language of the policies, the insurers have a "duty to defend any suit against the insured seeking damages on account of . . . bodily injury or property damage" that arguably falls within the policy coverage period.[22] *See, e.g.*, *Upjohn Co. v. Aetna Cas. & Sur. Co.*, 768 F. Supp. 1186, 1196 (W.D. Mich. 1990) (applying Michigan law).  The insurers can avoid its duty to defend only if the plain language of the policies unambiguously demonstrate that they did

---

[22]  "Unlike most contractual relationships, where the parties negotiate contract terms, the terms of liability insurance contracts are standardized and are drafted by the insurance industry. Policyholders have little or no bargaining power to change terms.  Consequently, in construing insurance contracts, any ambiguities are strictly construed against the insurer to maximize coverage."  *Am. Bumper & Mfg. Co.*, 550 N.W.2d at 479–80 (citations omitted).

not contract to defend Wolverine in suits of the type alleged in the underlying actions. *See Ray*

*Indus., Inc. v.*, 974 F.2d at 758-59 (applying Michigan law).

Insurers argue that the scope of coverage is limited here by a pollution exclusion clause.[23]

*Alticor, Inc. v. Nat'l Union Fire Ins. Co. of Pennsylvania*, 916 F. Supp. 2d 813, 822 (W.D. Mich.

2013) ("The insurer bears the burden of establishing that an exclusion applies."). The Special

Master concluded that there had not been sufficient factual development in the underlying actions

to determine whether the pollution discharges at issue here were sudden and accidental under the

sudden and accidental exception to the exclusion clause (ECF No. 1106 at PageID.114875-

114876).

The Special Master relied on *Polkow v. Citizens Ins. Co. of Am.*, 476 N.W.2d 382, 384

(Mich. 1991) for this conclusion (*id.*). *Polkow* states that

> [f]airness requires that there be a duty to defend at least until there is sufficient
> factual development to determine what caused the pollution so that a determination
> can be made regarding whether the discharge was sudden and accidental. Until that
> time, the allegations must be seen as "arguably" within the comprehensive liability
> policy, resulting in a duty to defend.

*Id.* Century specifically objected to the Special Master's conclusion because the underlying

environmental actions "allege that Wolverine is liable for its long-term direct and intentional

dumping and discharge of chemical-laden wastes at various locations" (ECF No. 1131 at

PageID.116176). This argument, however, does not respond to the Special Master's full

conclusion.

---

[23] The duty to defend does not apply to "bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon the land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental" (ECF No. 1131 at PageID.116175, quoting Comprehensive General Liability Insurance Issued by Insurance Company of North America, ECF No. 1-1 at PageID.197).

The Special Master correctly concluded that an insurer is required to defend the entirety of a lawsuit until it is determined that every claim in the lawsuit involving pollution is conclusively determined to be intentionally discharged by Wolverine (ECF No. 1106 at PageID.114875).[24] *Am. Bumper & Mfg. Co.*, 550 N.W.2d at 486  ("although the EPA originally focused on waste materials intentionally discharged into a seepage lagoon pursuant to a DNR groundwater discharge permit, as the investigation proceeded, the focus broadened to include materials that were not part of this intentional discharge.   Consequently, during the relevant defense period, there remained uncertainties regarding the source, cause" and any contamination that may have been found to have a sudden and accident cause, thus escaping the pollution exclusion).

From a review of the allegations in the underlying actions, it is clear to the Court that the allegations arguably include damage from intentional and unintentional or accidental contamination.[25]  Thus, the Court will not enforce the pollution exclusion at this stage, and the Court adopts the Special Master's conclusion regarding the pollution exclusion.

---

[24]  "[I]nsurers owe a duty to defend until the claims against the policyholder are confined to those theories outside the scope of coverage under the policy.  *Am. Bumper & Mfg. Co.*, 550 N.W.2d at 483.  "[I]f coverage is provided for some claims in the underlying suit, the insurer must defend all of the claims in the underlying suit. If there is doubt regarding whether the insurer has the duty to defend, the doubt must be resolved in favor of the policyholder." *Aetna Cas. & Sur. Co. v. Dow Chem. Co.*, 933 F. Supp. 675, 679 (E.D. Mich. 1996).

[25]  For example, the *Bronkema v. Wolverine World Wide, Inc.* suit, which Century marshals in support of its position, alleges negligent handling of tannery wastes:

> 551. Because tannery waste is present at Wolverine's House Street Property and Wolverine's House Street Property is not capped, lined, or otherwise guarded against groundwater, it may reasonably be anticipated that tannery waste will be released from Wolverine's House Street Property.
>
> * * *
>
> 569. It always was and still is reasonably foreseeable that gravity would cause tannery waste dumped into unlined pits at an uncapped landfill to leach into groundwater.

(ECF No. 1131 at PageID.116177-116178, quoting Bronkema Complaint, ECF No. 544-6 at PageID.32648-32758).

*2. Whether the Insurers Have Fulfilled Their Defense Duties*

The insurers specifically take issue with the Special Master's finding that "in this case, [the provision of a] defense means hiring an attorney for Wolverine, have that attorney file an appearance for Wolverine and arrange to execute a substitution of attorney as necessary" (ECF No. 1106 at PageID.114894).  According to the insurers, the Special Master misread the factual record and the context, and there is no authority in Michigan law for the proposition that the insurers were required to assume Wolverine's defense (ECF No. 1129 at PageID.115846-115846; ECF No. 1133 at PageID.116902).  Wolverine responds that the duty to defend means exactly what it says it means, *i.e.*, the provision of legal services.

The Court agrees with Wolverine on this issue.  "[T]he undertaking to defend is absolute." *City Poultry & Egg Co. v. Hawkeye Cas. Co.*, 298 N.W. 114, 115 (Mich. 1941).  "A breach of that duty can be determined objectively, without reference to the good or bad faith of the insurer.  If the insurer had an obligation to defend and failed to fulfill that obligation, then, like any other party who fails to perform its contractual obligations, it becomes liable for all foreseeable damages flowing from the breach." *Stockdale*, 330 N.W.2d at 392. Moreover, "the insured should reasonably expect that the insurer will employ its vast legal and investigative resources to defeat the action for the mutual benefit of both the insurer and the insured." *Allstate Ins. Co.*, 443 N.W.2d at 756 n.3.

Here, it is indisputable that the insurers have not assumed Wolverine's defense.[26]  The insurers, however, maintain that they responded to Wolverine's notice of suit—notice of the duty

---

[26]  The Court finds that assuming that Wolverine retained counsel ten months prior to notice of the duty to defend, the insurers had the opportunity to coordinate a defense and marshal their resources to defeat the action for the mutual benefit of both the insurers and the insured and they have not argued to the contrary.

to defend—within a reasonable time, and they are doing exactly what Wolverine requested of them, namely, participating in the defense through sharing in the defense costs.  At the very least, the insurers argue they have a created a genuine issue of material fact as to whether Wolverine's requests for "participation," "costs sharing," and steadfast control of its defense, modified their duties to defend (ECF No. 1131 at PageID.116160).   Wolverine argues that the request to participate in defense and share in the existing defense costs did not excuse or modify the insurers' duty to defend under the terms of the policy, as the Special Master concluded (ECF No. 155 at PageID.118625, citing ECF No. 1106 at PageID.114892).

The Court finds that the insurers have not made a strong showing of modification or excuse to avoid its contractual duties.[27]   "Insurance policies are contracts and, in the absence of an applicable statute, are subject to the same contract construction principles that apply to any other species of contract." *Titan Ins. Co. v. Hyten*, 817 N.W.2d 562, 567 (Mich. 2012) (internal quotations and citations omitted).   Under Michigan law, for a modification of a contract to be effective, "it must be supported by additional consideration or reduced to a writing that is signed by the party against whom the modification is charged." *Fournier v. L'Attitude Holdings, LLC*, No. 325459, 2015 WL 6162077, at *2 (Mich. Ct. App. Oct. 20, 2015).[28]   Here, the insurers have not alleged that they provided additional consideration to Wolverine for a modification or that Wolverine executed a writing releasing the insurers from their duty to defend.  Thus, the bargained

---

[27]  Alternatively, the insurers have not shown that Wolverine waived its entire right to a defense, even if Wolverine provided notice of the duty to defend ten months after retaining counsel.  *See, e.g.*, *Century Indem. Co.*, 318 F. Supp. 2d 530, 544 (W.D. Mich. 2003).

[28]  "The judiciary is without authority to modify unambiguous contracts or rebalance the contractual equities struck by the contracting parties because fundamental principles of contract law preclude such subjective post hoc judicial determinations of 'reasonableness' as a basis upon which courts may refuse to enforce unambiguous contractual provisions." *Auto Owners Ins. Co. v. Ferwerda Enterprises, Inc.*, 771 N.W.2d 434, 438–39 (Mich. Ct. App. 2009) (internal quotations, citations, and alterations omitted).

for exchange, insurance premiums for the duty to defend, remains untouched.  Moreover, to the extent the insurers argue that they have already paid for or are paying Wolverine's defense costs, "[u]nder the preexisting duty rule, it is well settled that doing what one is legally bound to do is not consideration for a new promise."  *Yerkovich v. AAA*, 610 N.W.2d 542, 546 (Mich. 2000).

Finally, assuming for the sake of argument that Wolverine rejected the insurers' defense, the onus is on the insurers to bargain for a writing relieving them of the duty to defend.[29]  Until such time, there is no issue of material fact that, as the insurers concede, they have not assumed Wolverine's defense, and, thus, they have breached and are continuing to breach their defense duties.

### III. CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that the Court APPROVES AND ADOPTS the Special Master's Report and Recommendation (ECF No. 1106) as the Opinion of the Court.

**IT IS FURTHER ORDERED** that "Plaintiff Wolverine World Wide, Inc.'s Motion for Partial Summary Judgment Regarding Certain Defendants' Breaches of Their Defense Duties" (ECF No. 497) is GRANTED.

**IT IS FURTHER ORDERED** that "Travelers Rule 53(f)(2) Objections to the Special Master's Report and Recommendation on Plaintiff's Motion for Partial Summary Judgment Regarding Certain Defendants' Breach of Defense Duties" (ECF No. 1129) are DENIED.

**IT IS FURTHER ORDERED** that "Defendant Century's Rule 53(f)(2) Objections to Special Master's Report and Recommendation on Plaintiff's Motion for Partial Summary

---

[29]  Alternatively, the insurers could show that Wolverine made performance impossible, *Brucker v. Manistee & G.R.R. Co.*, 130 N.W. 822, 825–26 (Mich. 1911), but not on the facts currently before the Court.

Judgment  Regarding  Certain  Defendant's  Breach  of  Defense  Duties"  (ECF  No.  1131)  are DENIED.

      **IT IS FURTHER ORDERED** that "Employers Insurance Company of Wausau's Rule 53(f)(2) Objections to the Special Master's Report and Recommendation on Plaintiff's Motion for Partial Summary Judgment Regarding Certain Defendants' Breach of Defense Duties" (ECF No. 1133) are DENIED.

Dated: October 18, 2021

                                     /s/ Janet T. Neff
                                      _____
                                      JANET T. NEFF
                                      United States District Judge