# **<u>EXHIBIT 1</u>**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

WOLVERINE WORLD WIDE, INC.,

     Plaintiff,

v.

THE AMERICAN INSURANCE COMPANY, et al.,

     Defendants.

Case No. 1:19-cv-00010-JTN-SJB

Hon. Janet T. Neff
Mag. Judge Sally J. Berens
Special Master Paula Manderfield

---

## PLAINTIFF WOLVERINE WORLD WIDE, INC.'S OBJECTIONS AND RESPONSES TO CERTAIN DEFENDANTS' THIRD SET OF PHASE II INTERROGATORIES

     Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Wolverine World Wide, Inc. ("Wolverine" or "Plaintiff"), by its attorneys, hereby submits its objections and responses to Certain Defendants' Third Set of Phase II Interrogatories to Wolverine. These Responses, and any and all documents and information referenced herein, are being provided subject to the Protective Order in this Action, are deemed confidential, are to be treated as submitted under seal, and are only to be utilized in accordance with the appropriate procedures.

## GENERAL OBJECTIONS

     The following general objections shall pertain to each and every Interrogatory whether or not separately stated in response thereto:

     1.     Wolverine objects to each Interrogatory to the extent it imposes upon Wolverine obligations beyond, or in contravention of, the Federal Rules of Civil Procedure and/or the Local Rules of this Court.

     2.     Wolverine objects to each Interrogatory to the extent that it seeks information concerning issues that are currently in dispute and should properly be resolved only in the

Underlying Actions,[1] such that requiring a response by Wolverine in this coverage litigation would interfere with and potentially prejudice Wolverine's defense.  Many of the Interrogatories presume alleged polluting events that are contested, such that responses to those Interrogatories potentially could be used against Wolverine in pending Underlying Actions.  *U.S. Fire Ins. Co. v. City of Warren*, 10-CV-13128, 2012 WL 13006043 (E.D. Mich. July 25, 2012) (issuing stay given overlap between coverage issues and issues in underlying action against insured); *U.S. Fid. & Guar. Co. v. Thomas Solvent Co.*, 683 F. Supp. 1139, 1162 (W.D. Mich. 1988), *opinion vacated on reconsideration* (Mar. 17, 1988), *opinion clarified* (Apr. 14, 1988) ("[There is] no reason why the insured, whose insurer is obligated by contract to defend him, should have to try the facts in a suit against [its] insurer in order to obtain a defense."); *Fireman's Fund Ins. Cos. v. Ex-Cell-O Corp.*, 790 F. Supp. 1318, 1321 (E.D. Mich. 1992) ("it is inappropriate to determine now which consulting fees and hydrogeological studies are reasonable and proper defense costs since the Underlying Actions initiated by the PRP (potentially responsible party) letters are unresolved").

These Interrogatories go to the heart of the issues in dispute in the Underlying Actions against which Wolverine continues to vigorously defend itself. Such discovery requests are improper:

> What plaintiff has attempted to do here is to litigate … the [insureds'] liability … in the underlying tort action, putting the [insureds] in the conflictive position of being required to abandon their denial of liability in that action in order to come within the [sudden and accidental] exception to the policy exclusion…. ***An insurer may not put its insured in that position***. Given plaintiff's obligation to defend, there can be no detriment to it to abide the final outcome of the underlying action to determine whether it is obligated to indemnify.

*N. Pac. Ins. Co. v. Wilson's Distrib. Serv., Inc.*, 138 Or. App. 166, 175, 908 P.2d 827, 832 (1995) (emphasis added); *see also Hutchinson Oil Co. v. Federated Serv. Ins. Co.*, 851 F. Supp. 1546,

---

[1] Unless otherwise stated, capitalized terms herein are assigned the same meaning as in the Complaint (ECF 1-1).

1557 (D. Wyo. 1994) (finding that pending issues relevant to indemnity, including application of the "sudden and accidental" pollution exclusion, "in the opinion of this Court, are critical to a final disposition of any coverage issues that may arise in this case"). Further, Defendants' efforts to protect their own interests by seeking discovery that threatens to jeopardize Wolverine's defense of the Underlying Actions amounts to bad faith claims handling. *See Com. Union Ins. Co. v. Liberty Mut. Ins. Co.*, 426 Mich. 127, 136–37, 393 N.W.2d 161 (1986) ("If the insurer is motivated by selfish purpose or by a desire to protect its own interests at the expense of its insured's interest, bad faith exists").

3.      Wolverine objects to each Interrogatory to the extent that it seeks information protected by the attorney-client privilege, the work-product doctrine and/or any other applicable privilege or protection recognized under applicable law. Any inadvertent production of any information protected by the attorney-client privilege, the work-product doctrine and/or any other applicable privilege or protection recognized under applicable law or otherwise protected or immune from discovery shall not constitute a waiver of any privilege or of any other ground for objecting to discovery of such information, its subject matter or information contained therein or of Wolverine's right to object to the use of such material during any later proceeding. Defendants have failed and refused to defend and indemnify Wolverine in the Underlying Actions and Wolverine is in active litigation with Defendants regarding these very disputes, among others. Accordingly, this adversarial relationship has created a conflict of interest that eliminates any "common interest" privilege that would otherwise potentially permit Wolverine to share privileged information with Defendants. *See U.S. Fire Ins. Co. v. City of Warren*, No. 2:10-cv-13128, 2012 WL 2190747, at *6 (E.D. Mich. June 14, 2012) ("because [the common interest] doctrine is based on the alliance of interests between an insured and its insurer, and because such an alliance of

interests does not exist where coverage is disputed, this doctrine is not applicable, and this [sic] insured-attorney communications remain privileged with respect to the insurer, whereas here there remains a dispute as to coverage").

4.      Wolverine objects to each Interrogatory as being propounded in violation of Federal Rule of Civil Procedure 33(a)(1) which expressly prohibits a party from serving in excess of 25 written interrogatories (including all discrete subparts).

5.      Wolverine objects to each Interrogatory to the extent that it purports to require Wolverine to undertake the unduly burdensome task of seeking or identifying documents or information currently in the possession of third parties.

6.      Wolverine objects to each Interrogatory to the extent that it seeks information generally available to the public and/or in the public domain and thus equally available to the Defendants.

7.      Wolverine objects to each Interrogatory to the extent that it seeks information already in Defendants' possession, including information that previously was provided by Wolverine to Defendants or otherwise obtained by Defendants from third parties or public sources.

8.      Wolverine objects to each Interrogatory to the extent that it seeks information that is proprietary, confidential, sensitive or competitive in nature.  Any inadvertent disclosure of proprietary, confidential or otherwise competitively sensitive information shall not constitute a waiver of the proprietary, confidential and/or competitively sensitive nature of the material.

9.      Wolverine objects to the Interrogatories to the extent the Interrogatories are unreasonable, duplicative, cumulative, and/or unduly burdensome.  Wolverine reserves the right to decline to respond further to the Interrogatories on the ground that they are unreasonable, duplicative, cumulative, and/or unduly burdensome.

10.     Wolverine objects to the Interrogatories to the extent the Interrogatories are irrelevant due to Defendants being estopped from raising or relying on any defenses to coverage.

11.     Wolverine objects to the Interrogatories to the extent the Interrogatories are overly broad and unduly burdensome because they are unlimited in time and/or scope.

12.     Wolverine reserves the right to supplement and/or amend its responses as may be necessary or appropriate for any reason, including but not limited to as a result of Wolverine's continued investigation thereof, and/or as directed by the Court.

13.     Wolverine's responses and objections asserted herein, including its General Objections, are asserted solely for the purposes of this Action.  Each response is subject to all objections on competence, relevance, materiality, propriety and admissibility, and any and all other objections and grounds that would require the exclusion of any statement, document or information produced or provided as a response.  All such objections and grounds are reserved and may be interposed at the time of trial, arbitration, hearing, or any other proceeding in this Action.

14.     Nothing in Wolverine's responses to the Interrogatories shall be construed as an admission regarding the admissibility or relevance of any information, or of the truth or accuracy of any characterization of any matter contained in the Interrogatories themselves or in the documents and/or information produced in response.  Also, no incidental or implied admissions are intended by Wolverine's responses to these Interrogatories.  The fact that Wolverine has answered or objected to any Interrogatory, or any part thereof, should not be construed as an admission that Wolverine accepts or admits the existence of any facts set forth or assumed by such Interrogatory, or that such response or objection, or any information provided in connection therewith, constitutes relevant or admissible evidence.  That Wolverine has answered all or part of any Interrogatory is not intended to be and shall not be construed as a waiver of any objection and

5

all such objections are preserved.  Wolverine specifically reserves its rights to assert additional objections to the Interrogatories and/or to seek protection from the Court, including, but not limited to, seeking a protective order.

15.     Wolverine's responses are based only on the information, witnesses, and documents presently available to and known by Wolverine.  Further fact and expert discovery, independent investigation, legal research and analysis may give rise to new contentions, facts, documents and testimony, as well as establish entirely new facts or conclusions and legal contentions, all of which may lead to substantial additions to, changes in, or variations from these responses.  Accordingly, Wolverine reserves the right to change, modify, supplement, add to, or subtract from its responses, up to the time of trial, as new, different or additional information, facts, documents, evidence or witnesses become known to or are recalled by Wolverine, as further analyses are made, legal research is compiled, and/or contentions are made. These responses are given without prejudice to further discovery, research, and/or analyses.

16.     Wolverine objects to the Interrogatories to the extent the Interrogatories seek information that is the subject of expert testimony, because expert discovery has not yet commenced in Phase II of the Coverage Action. Wolverine reserves the right to decline to respond to an Interrogatory on the basis that it seeks information that should be properly obtained through expert discovery.

17.     Each of these General Objections is incorporated into each response by Wolverine to each specific Interrogatory as if fully set forth therein.

## **OBJECTIONS TO DEFINITIONS**

Wolverine objects to each "Definition" contained in the Interrogatories to the extent that: it is or may be vague, overly broad, unduly burdensome; imposes obligations beyond, inconsistent

with, or in contravention of, the requirements of the Federal Rules of Civil Procedure, the Local Rules of this Court, prior rulings by the Court in this matter, or applicable law; or seeks information that is not relevant to the subject matter of this Action. Wolverine objects to each "Definition" to the extent it is inconsistent with the definition or meaning of the term(s) under each separate Defendant's Policies, or according to Michigan law, including but not limited to Your Definition(s) of "Bodily Injury" and "Property Damage."

## <u>OBJECTIONS TO INSTRUCTIONS</u>

Wolverine objects to each "Instruction" contained in the Interrogatories to the extent it is or may be vague, overly broad, unduly burdensome, or impose obligations beyond the requirements of the Federal Rules of Civil Procedure or applicable law.

1.      Wolverine is required, in responding to these discovery requests, to obtain and furnish all information available to Wolverine and any of its representatives, employees, agents, servants or attorneys and to obtain and furnish all information that is in its possession or under its control, or in the possession or under the control of any of its representatives, employees, agents or attorneys.

**RESPONSE:** Wolverine incorporates its General Objections as if stated in full herein. Wolverine further objects to this Instruction as overbroad, vague and ambiguous, and further objects to the extent that it seeks documents and information protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or both.

2.      Any discovery request propounded in the disjunctive shall also be read as if it is propounded in the conjunctive and vice versa. Any discovery request propounded in the singular shall also be read as if propounded in the plural and vice versa. Any discovery request propounded in the present tense shall also be read as if propounded in the past tense and vice versa. The terms "and" or "or" shall be construed either conjunctively or disjunctively as is necessary to make the Interrogatory inclusive rather than exclusive. The term "all" shall be construed to include "every," "any," and "each" as is necessary to make each discovery request inclusive rather than exclusive.

**RESPONSE:** Wolverine incorporates its General Objections as if stated in full herein. Wolverine further objects to this Instruction as overbroad, vague and ambiguous.

3.      These discovery requests are continuing and require amendment or supplementation if Wolverine or its attorneys later become aware of facts indicating that the response previously given was incorrect, inaccurate or incomplete.

**RESPONSE:** Wolverine incorporates its General Objections as if stated in full herein.

Wolverine further objects to this Instruction to the extent that it imposes obligations on Wolverine

that are beyond, or in contravention of, the Federal Rules of Civil Procedure and/or the Local Rules

of this Court.

4.      For any Document responsive to an Interrogatory that You have produced or are producing contemporaneously with Your responses to these discovery requests, identify the Bates Number(s) responsive to said Interrogatory.  Keep all documents in the manner that You received them.

**RESPONSE:** Wolverine incorporates its General Objections as if stated in full herein.

Wolverine further objects to this Instruction as vague and ambiguous. Wolverine further objects

to this Instruction to the extent that it imposes obligations on Wolverine that are beyond, or in

contravention of, the Federal Rules of Civil Procedure and/or the Local Rules of this Court. This

Instruction is also overbroad and unduly burdensome in its request for Wolverine to identify the

Bates Number(a) for "any" Document that Wolverine has produced responsive to an Interrogatory,

as Wolverine has produced over 7 million pages of documents in this matter.

5.      For any information You withhold because of a claim of privilege or protection, state the nature of the information withheld and identify the precise privilege or protection claimed with sufficient specificity to permit a full determination of whether the claim of privilege or protection is valid. With respect to documents deemed by You to be privileged, provide the following information identifying those documents which You decline to produce:

a.      the Bates Stamp Number or other identifying number of the document;

b.      the date and title of the document;

c.      the author and recipient(s) of the document, including any persons who received a copy of the document;

d.      the subject matter of the document; and,

e.      the privilege or other basis upon which the document was withheld.

**RESPONSE:** Wolverine incorporates its General Objections as if stated in full herein. Wolverine further objects to this Instruction as vague and ambiguous.  Wolverine objects to this Instruction to the extent that it imposes obligations on Wolverine that are beyond, or in contravention of, the Federal Rules of Civil Procedure and/or the Local Rules of this Court.

## RESPONSES AND OBJECTIONS TO INTERROGATORIES

1.      State whether You are aware of any "sudden and accidental" discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquid or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water that is not alleged in the operative Complaint in any Underlying Action, but forms or possibly forms the basis of any claim asserted or alleged in any Underlying Action.

**RESPONSE:** Wolverine incorporates its General Objections as if stated in full herein. Wolverine objects to the terms "sudden," "accidental," and "pollutants" as legal terms of art and, as such, this Interrogatory seeks a legal conclusion, legal analysis, or mental impressions of Wolverine's attorneys. Further, because the issue of whether or not a "sudden and accidental" exception to a pollution exclusion applies, as part of an exclusion being advanced by Defendants to preclude or limit coverage, is an issue of law at the heart of this Coverage Action, Wolverine objects to this Interrogatory to the extent it seeks legal conclusions. Wolverine also objects to these terms as individually, collectively, and in the context of this Interrogatory, vague and ambiguous: "sudden," "accidental," "discharge," "dispersal," "release," "escape," "contaminants," and "pollutants." Wolverine also objects to this Interrogatory to the extent it suggests that PFAS is a "pollutant," because there has been no finding by the Court in this Coverage Action regarding whether PFAS constitutes a "pollutant" under Michigan law or within the meaning of Defendants' Policies.

Wolverine objects to this Interrogatory as overbroad and unduly burdensome to the extent it seeks information regarding non-PFAS containing waste and/or discharges, because the Special Master correctly found in this Action that, "*in considering the application of the pollution exclusions in this case, the proper focus is on discharges related to PFAS and not on other types of discharges*[.]" (ECF No. 1517, PageID.126964-126965) (emphasis added). Wolverine specifically objects to the phrase "in any Underlying Actions" as vague and overbroad, given that more than 270 individual lawsuits have been filed against Wolverine by plaintiffs in the Underlying Actions, some of which remain pending.

Wolverine further objects to this Interrogatory as being propounded in violation of Federal Rule of Civil Procedure 33(a)(1), which expressly prohibits a party from serving in excess of 25 written interrogatories (including all discrete subparts). This Interrogatory seeks unique information with respect to more than 280 Underlying Actions, and therefore egregiously exceeds the amount of Interrogatories permitted by Rule 33(a)(1).

Wolverine also objects to this Interrogatory to the extent it seeks information already in Defendants' possession – including information that has been previously provided by Wolverine to Defendants and is equally known to or equally available to Defendants. The burden of deriving or determining the answer(s) will be substantially the same for either party from the over 7 million pages of documents already produced by Wolverine in this litigation.

Wolverine further objects to this Interrogatory because it seeks information prejudicial to Wolverine's defense in the Underlying Actions, and because it seeks legal analyses and legal conclusions. Wolverine objects to the premise of this Interrogatory and its characterization of the Underlying Actions.  Wolverine objects to this Interrogatory because it seeks information about issues that are currently in dispute in the Underlying Actions and should properly be resolved only

in the Underlying Actions, such that requiring a response by Wolverine in this Coverage Action would interfere with and potentially prejudice Wolverine's defense.  This Interrogatory asks Wolverine to provide information about alleged "polluting events" that "contributed to any actual or potential liability…" – information that goes to the heart of allegations against Wolverine in the Underlying Actions and which would be used against Wolverine in still-pending Underlying Actions. *Am. Bumper*, 452 Mich. at 450–452; *Thomas Solvent*, 683 F. Supp. at 1162; *Ex-Cell-O*, 790 F. Supp. at 1321; *see also Wilson's Distrib.*, 138 Or. App. at 175; *Hutchinson*, 851 F. Supp. at 1557.  Further, Defendants' conscious and deliberate efforts to protect their own financial interests by seeking discovery that threatens to jeopardize, prejudice, and harm Wolverine's defense of the Underlying Actions amounts to bad faith.  For example, this Interrogatory asks Wolverine to presume alleged polluting events that are contested and admit to actual or potential liability, such that a response to this Interrogatory potentially could and would be used against Wolverine in pending and future Underlying Actions.

This Interrogatory is premature because fact discovery is ongoing and expert discovery has not yet begun in Phase II. Defendants have already received the entirety of documents available from the Underlying Actions at this time, and Defendants are seeking Wolverine's own legal analysis and impressions as to application of those facts to legal issues in this Action, including application of Your pollution exclusions—which You drafted and presume apply in the first instance—a burden which you have not carried and which has been specifically rejected by this Court.  This Interrogatory also is premature to the extent that it seeks information that is the subject of expert analysis and opinion which will be provided through Wolverine's experts' forthcoming reports and testimony.

11

Subject to and without waiving the foregoing objections and General Objections, Wolverine submits there have been "sudden and accidental" discharges, dispersals, releases and/or escapes of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquid or gases, waste materials or other irritants, contaminants and/or pollutants into or upon land, the atmosphere or any water course or body of water, each of which included PFAS, among other chemicals, compounds, liquids, gases, waster material, or other irritants and compounds—and which form(ed) the basis of and/or substantially contribute(d) to the claims asserted by plaintiffs in the Underlying Actions alleging Property Damage, Bodily Injury, and/or Personal Injury—each of which has occurred during the period(s) of the Policies sold by Defendants to Wolverine at issue in this Action.

Wolverine's investigation is ongoing, as is Phase II fact discovery. Additionally, Phase II expert discovery has not yet commenced in this Action. Accordingly, Wolverine fully reserves its right to supplement this Response as more information becomes available.

2.       If Your answer to Interrogatory No. 1 is anything other than an unqualified "No," Identify and Describe each such "sudden and accidental" discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquid or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water of which You are aware.

**RESPONSE:** Wolverine incorporates its General Objections as if stated in full herein. Wolverine also incorporates its objections and answers to Interrogatory No. 1, as if stated in full herein. Subject to and without waiving the foregoing objections and General Objections, Wolverine states as follows:

Below, Wolverine has identified certain events or incidents, each of which resulted in a sudden, accidental, unexpected, and unintentional discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquid or gases, waste materials or other

irritants, contaminants or pollutants, which included, among other chemicals and compounds, PFAS and/or PFAS-containing materials into or upon land, the atmosphere or watercourse or body of water—each of which gave rise to an occurrence, including alleged Property Damage, Bodily Injury, and Personal Injury during the period of each of the Policies issued by Defendants to Wolverine at issue in this Action (the "Sudden and Accidental Releases"). Each of these Sudden and Accidental Releases involved discrete and isolated events that occurred abruptly, suddenly, accidentally, unexpectedly, unintentionally, and without warning, as described in this Response and in Wolverine's Response to Interrogatory No. 3, below. Wolverine hereby identifies and describes the following Sudden and Accidental Releases, each of which contributed directly and/or indirectly to Wolverine's alleged liability in each of the Underlying Actions, for each allegation of Property Damage, Bodily Injury, and/or Personal Injury Claims—each of which occurred during the period of the Policies sold by Defendants to Wolverine at issue in this Action, as set forth below:

(a) **1965 Tornado.** In the spring of 1965, a tornado referred to as the "Palm Sunday Tornado" caused significant damage at the tannery property and caused Sudden and Accidental Releases of various chemicals, liquids, and materials (including, but not limited to, those containing PFAS) onto land and water at the tannery property and into land and water surrounding the tannery property. When the tornado passed through Rockford, its destruction at and around the tannery caused Sudden and Accidental Releases of PFAS-containing Scotchgard and other chemicals, liquids, materials, and compounds into the land, water, and surrounding environment. The resultant damage and Sudden and Accidental Releases required remedial action, and repairs were required at and around the tannery property and surrounding area in the weeks and

13

months that followed.  The force of the tornado destroyed Wolverine's personal property, including tannery supplies, equipment, materials and/or products, and uncontrollably spread debris, chemicals, liquids, and other materials (including those containing PFAS) upon, around and away from the tannery property, including onto land and into water.  Among other damage, the tornado significantly damaged a building on the tannery property known as the "little red shoe house," which historically stored finished leather scraps. These finished leather scraps had already been treated with PFAS-containing Scotchgard in the tannery as part of the coloring process. The tornado's damage to the "little red shoe house" caused a significant quantity of these finished leather scraps to scatter and spread across and off the tannery property, into the land and water on and off the tannery property. Due to these Sudden and Accidental Releases, scraps of finished leather were spread throughout the land and water on and around the tannery site. Because much of the impacted property and many of the affected materials (including, but not limited to, the leather scraps) had previously been treated with PFAS, the tornado caused an abrupt, unexpected, unintended, sudden and accidental discharge (or discharges) of PFAS and/or PFAS-containing materials throughout the land and water on tannery property, and into surrounding land, soil, water, groundwater, and surfacewater in and around the tannery property. Also, because the tornado was an "act of god," all resulting Sudden and Accidental Releases were sudden, accidental, unexpected, and unintended.  Each of the Sudden and Accidental Releases described herein contributed directly or indirectly to Wolverine's alleged liability in each of the Underlying Actions with respect to each claim of Property Damage, Bodily Injury, and/or Personal Injury—each of which

14

occurred during the period of the Policies sold by Defendants to Wolverine at issue in this Action. This event will be referred to hereinafter as the "**1965 Tornado.**"

(b) **<u>Train Crash.</u>**  Around Easter of 1966, which was on April 10, 1966, a train car crashed into the maintenance department at the tannery, causing Sudden and Accidental Releases of various chemicals, liquids, and materials (including, but not limited to, those containing PFAS) onto land, air and water at the tannery property and into land, air, and water surrounding the tannery property (the "**Train Crash**").  At that time, the tannery received about fifty-percent of the hides it used in the tanning process from rail cars.  During the night of the train crash, while a train was traveling through Rockford along the banks of the Rogue River and carrying, among other things, hides for the tannery, a switch panel for the track was accidentally set in the wrong direction. This mistaken switch position caused a disastrous train derailment which involved, among other things, two locomotives crashing into the back side of the tannery's loading dock and into the maintenance department at the tannery.  This high-impact collision caused a series of chemical-containing tanks, including tanks likely containing PFAS and other chemicals, liquids, materials, and compounds, to suddenly, abruptly, accidentally, and unexpectedly spill into the parking lot at the tannery and into the surrounding land and water around the tannery. Each of these Sudden and Accidental Releases described herein contributed directly or indirectly to Wolverine's alleged liability in each of the Underlying Actions with respect to each claim of Property Damage, Bodily Injury, and/or Personal Injury—each of which occurred during the period of the Policies sold by Defendants to Wolverine at issue in this Action. This event will be referred to hereinafter as the "**Train Crash.**"

(c)    **Derecho Wind Event.**   Between March 30, 1998 and March 31, 1998, a strong, straight-line wind event, referred to as a "derecho," passed through the Rockford, Michigan area—including directly the tannery property, causing Sudden and Accidental Releases of various chemicals, liquids, and materials (including, but not limited to, those containing PFAS) onto and into air, land, and water at the tannery property and into and onto air, land, and water surrounding the tannery property (the "**Derecho Wind Event**"). The Derecho Wind Event brought extreme winds between approximately 60 and 100 mph across each of Wolverine's properties in the area, including the tannery and House Street properties, and resulted in Sudden and Accidental Releases of PFAS and other liquids, materials, chemicals and compounds into and upon land, air and water at the tannery and House street and upon the land, air, and water surrounding the tannery and House Street.   The Derecho Wind Event occurred outside Wolverine's normal operating hours, in the early morning hours. In response to the Derecho Wind Event, Wolverine employees, including members of the tannery maintenance crew, traveled to the tannery in the early hours of the morning to respond to and remediate the damage and Sudden and Accidental Releases that the extreme wind conditions caused—and to secure the property to prevent additional damage and Sudden and Accidental Releases of other chemicals, liquids, materials, and compounds, including, but not limited to, PFAS.   The Derecho Wind Event caused PFAS-containing chemicals, liquids, and other materials from the tannery to be discharged on and into land, soil, air, and water at and around the tannery and House Street properties and upon and onto the land and water surrounding the tannery and House Street. After the Derecho Wind Event, Wolverine employees had to remove

tannery debris, scraps, buckets, and other materials out of Rum Creek, which is a creek that runs through the tannery property and connects to the Rogue River. The Derecho Wind Event caused large, one-thousand gallon metal storage tanks to blow over on their side(s), resulting in the Sudden and Accidental Releases of Scotchgard containing PFAS, and other liquids, chemicals, and compounds into the land and water at the tannery property and the land and water surrounding the tannery. The Derecho Wind Event also caused a southwestern wall of the tannery to collapse, resulting in debris, including bricks and roofing materials, to scatter across the tannery property. This tannery wall that collapsed because of the Derecho Wind Event contained pipes that were part of the piping system that transported PFAS-containing Scotchgard through and to the tannery's liquid wastewater disposal system to the Wastewater Treatment Plant ("WWTP"). As a result of the collapse of the wall at the tannery due to the Derecho Wind Event, Sudden and Accidental Releases of Scotchgard-containing PFAS and/or liquids, chemicals, and compounds into and onto land and water on tannery property and into the land and water surrounding tannery property. Each of the Sudden and Accidental Releases described herein contributed directly or indirectly to Wolverine's alleged liability in each of the Underlying Actions with respect to each claim of Property Damage, Bodily Injury, and/or Personal Injury. "**Derecho Wind Event.**"

(d)     **Dust Bin Fires.**  On a few isolated and discrete occasions between approximately 1976 and 1980, a fire spontaneously broke out inside of dust bins at the tannery, causing the dust bins to suddenly spew smoke, fire, and soot, resulting in Sudden and Accidental Releases of various chemicals, liquids, gases, and materials (including, but not limited

to, those containing PFAS) onto and into land, air, the atmosphere, and water at the tannery property and onto and into land and water surrounding the tannery property (the "**Dust Bin Fires**"). The dust bins that caught fire at the tannery were used to store dust that had been collected from sanding machines in the finishing department. As part of this process, the leather being sanded and finished had already been through the coloring process where PFAS-containing Scotchgard was applied. Thus, the dust that caught fire on each of these isolated and discrete occassions contained PFAS. As part of the tannery process, finished leather (treated with PFAS-containing Scotchgard) went through a sanding machine and the sanding machine generated a significant amount of friction, heat, and dust. Wolverine used a dust collection system through a vacuum system that collected the PFAS-containing dust from the finishing department and sanding machines, and transported the dust out of the tannery (the "Dust Collection System"). Wolverine operated the Dust Collection System on a daily basis. As part of the Dust Collection System, vacuum heads above the sanding machines collected the dust, the vacuums sent the dust into and through a system of tubes, and the tubes transported the dust out of the tannery building and deposited the dust into closed dust bins. The dust bins were approximately ten feet wide and twenty feet deep. Wolverine stored the filled dust bins in larger "dust containers," and the dust containers usually held three dust bins at a time. The dust containers were located near the parking lot on the tannery property. Unexpectedly, suddenly and accidentally, on a few isolated occasions between 1976 and 1980, fires spontaneously began inside of the dust bins. To stop the fires, Wolverine employees would have to act quickly by emptying the bins out and onto the ground near the WWTP where a large drain was located, at which

point the Wolverine employees would spray the bin and its contents with a water hose to put the fire out. Each of the isolated Dust Bin Fires started suddenly, unexpectedly, and accidentally, resulting in Sudden and Accidental Releases of dust, soot, fumes, smoke, and particles containing PFAS (and other chemicals and compounds) into and onto the land, water, air, and environment at the tannery property and into and onto the land, water, air, and atmosphere surrounding the tannery property—each of which occurred during the period of the Policies sold by Defendants to Wolverine at issue in this Action. These events, as described above, will be referred to hereinafter as the "**Dust Bin Fires.**"

(e)     **The Dust Container Fire.** On one occasion between approximately 1976 and 1980, a sudden, accidental, unexpected, unintended, and uncontrollable fire occurred at or around the tannery parking lot when the contents of a full dust container (holding several dust bins) spontaneously combusted, causing Sudden and Accidental Releases of various chemicals, liquids, and materials (including, but not limited to, those containing PFAS) into and onto land, air, and water at the tannery property and into and onto land, air, and water surrounding the tannery property (the "**Dust Container Fire**"). The Dust Container Fire ensued outside of the tannery building, in or around the parking lot on the tannery property. The fire was uncontrollable, and during the Dust Container fire, soot, fumes, smoke, ash, and dust containing PFAS and other chemicals and materials were Suddenly and Accidentally Released into and upon land, water, air, and the into the environment at and around the tannery property. Because Wolverine could not stop the large Dust Container Fire on its own, Wolverine called the City of Rockford Fire Department to extinguish the Dust Container Fire, and

firefighters responded at the scene and sprayed the fire with either water or firefighting foam (which may have also contained PFAS).   The Dust Container Fire caused PFAS-containing material (i.e., the dust particles, smoke, soot) to abruptly, suddenly, and unexpectedly, and accidentally discharge into the land, water, air and environment—and the firefighters' response activities may have exacerbated this discharge by spraying fire hoses containing hundreds of gallons of watern onto the burning dust containers, which also resulted in an unexpected, sudden, and accidental discharge of PFAS and other compounds and chemical onto the tannery property and surrounding environment. The cause of the Dust Container Fire remains unknown and under investigation. Each of the Sudden and Accidental Releases described herein contributed directly or indirectly to Wolverine's alleged liability in each of the Underlying Actions with respect to each claim of Property Damage, Bodily Injury, and/or Personal Injury—each of which occurred during the period of the Policies sold by Defendants to Wolverine at issue in this Action. This entire event, as described above, will be referred to hereinafter as the "**Dust Container Fire.**"

(f)   **Sludge Container Spills.**   Between approximately 1964 and 1966, several discrete and isolated spills of materials containing PFAS from trucks transporting tannery waste (which contained, among other chemicals and materials, PFAS) occurred, causing Sudden and Accidental Releases of various chemicals, liquids, and materials (including, but not limited to, those containing PFAS) into and onto land, air, atmosphere, and water at and around the tannery, and around the House Street property, and into the surrounding land, air, atmosphere, and water of third party property (the "**Sludge Container Spills**"). On several isolated and discrete occasions between 1964

and 1966, while Bell Pick-Up, a local trucking company, transported tannery waste (referred to as "sludge") away from the tannery property to House Street, waste material containing PFAS and other chemicals and compounds accidentally, suddenly, unexpectedly, unintentionally, and abruptly, spilled out of the truck, causing Sudden and Accidental Releases of PFAS and other compounds onto and into the land, air, and water at and around Wolverine's tannery and House Street properties, into the surrounding land, water, and environment, and directly onto and into the land, air, and water and atmosphere of third party property. Between 1964 and 1966, solid tannery waste was treated at the WWTP before being placed into large (approximately 5 feet long, 6 feet wide, and 8 feet deep) bucket-type containers which were then transported by, among others, Bell Pick-Up for disposal at House Street.   During transport on several isolated and discrete occasions between 1964 and 1966, waste materials (or sludge) from the tannery unexpectedly, accidentally, and suddenly spilled out of the container on the back of the pickup trucks, causing a Sudden and Accidental Release of PFAS-containing material into and upon the land, water, air, the atmosphere, and the environment at the tannery, at and around House Street, and into and onto the land, water, atmosphere and environment of third party property, including between the tannery and House Street properties. When these isolated and distinct spills of PFAS-containing material occurred, the pickup driver called the City of Rockford Fire Department to request assistance with cleaning up the sudden and accidental spill.  The Fire Department ordinarily would assist with cleaning up the spills by using their water hoses to disperse the spilled material from the road where the spills occurred and into the surrounding land, water, air, the atmosphere, and environment. This cleanup

21

method, which involved spraying large amounts of water to disperse the PFAS containing material (sludge), unintentionally, suddenly, and accidentally caused additional Sudden and Accidental Releases of PFAS and/or other chemicals and materials into the surrounding land, water, atmosphere, and environment in and around the tannery, House Street, and third party property in the Rockford area. Each of the Sudden and Accidental Releases described herein contributed directly or indirectly to Wolverine's alleged liability in each of the Underlying Actions with respect to each claim of Property Damage, Bodily Injury, and/or Personal Injury—each of which occurred during the period of the Policies sold by Defendants to Wolverine at issue in this Action. This entire event, as described above will be referred to hereinafter as the "**Sludge Container Spills**."

(g)     **Liquid Wastewater Overflow.**  Between approximately 1972 and 1985, several isolated and discrete incidents occurred, during which liquid waste (containing PFAS and other liquids, chemicals, and materials) in the tannery's piping system that flowed from the tannery to the WWTP unexpectedly, accidentally, unintentionally, and suddenly overflowed through the tannery drains due to unexpected blockages within the pipes, causing Sudden and Accidental Releases of various chemicals, liquids, and materials (including, but not limited to, those containing PFAS) into and onto land, air, and water, and into the atmosphere and environment at the tannery property and onto and into land, air, and water surrounding the tannery property. Wolverine's tannery was designed and built as a self-contained system where all liquid and solid waste by-product would be captured within an internal waste control system of floor drains that lead through a piping system flowing out of the tannery into Wolverine's WWTP where

all liquid and solid waste would be treated, including the separation of liquids from solids, prior to off-site disposal (the "Piping System"). The Piping System transported liquid and some smaller solid waste, including PFAS and other chemicals, liquids, and materials, from the tannery to the WWTP. The Piping System passed under the tannery, and under the parking lot near the tannery's loading dock where drains located at or around the loading dock fed into the Piping System.  During several discrete and isolated instances, the Piping System became blocked, causing an abrupt, sudden, accidental overflow of liquid waste (containing, among other liquids and chemicals, PFAS) into and upon the tannery land and water, and into the land and water surrounding the tannery.  During one discrete and isolate Liquid Wastewater Overflow incident, an unexpected, sudden, and accidental blockage occurred within the Piping System, causing the loading dock drain to abruptly and rapidly overflow, which resulted in a Sudden and Accidental Release of tannery wastewater containing PFAS and other liquids, chemicals, and compounds into and onto the land, air, and water on the tannery property and onto and into the land, air, and water surrounding the tannery property. In response to each of these discrete Liquid Wastewater Overflow incidents, Wolverine's maintenance employees remediated the occurrence by pinpointing the location of the blockage, clearing the Piping System and stopping the sudden and accidental overflow.  Each of these Liquid Wastewater Overflows resulted in a Sudden and Accidental Release of PFAS and other chemicals, liquids, and materials into and onto tannery land, air, and water, and into land, air, and water surrounding the tannery. Each of the Sudden and Accidental Releases described herein contributed directly or indirectly to Wolverine's alleged liability in each of the Underlying Actions with

23

respect to each claim of Property Damage, Bodily Injury, and/or Personal Injury—each of which occurred during the period of the Policies sold by Defendants to Wolverine at issue in this Action. This entire event, as described above, will be referred to hereinafter as the "**Liquid Wastewater Overflow**."

**(h)**   **Pipe Burst.**  Prior to mid-2004, a pipe burst occurred at the tannery, causing Sudden and Accidental Releases of various chemicals, liquids, and materials (including, but not limited to, those containing PFAS) into and onto the land, air and water on the tannery property and onto and into the land, air, and water surrounding the tannery property (the "**Pipe Burst**"). In mid-2004, Wolverine employees observed liquid escaping out of manhole and collecting on the floor under an electrician's bench in the tannery maintenance department.   A crawl space existed under the maintenance department, containing a portion of the Piping System flowing from the tannery to the WWTP. At certain times during and prior to 2004, the floor of the crawl space underneath the maintenance room was comprised of dirt soil. Immediately after Wolverine first discovered the liquid overflow in the maintenance room, Wolverine contacted a plumber to investigate the cause of the Pipe Burst.  To investigate the source of the Pipe Burst, the plumber ran a tracker with a scope through the pipe in question, and determined that the pipe had abruptly, suddenly, and accidentally cracked underneath the maintenance room, in the crawl space.  Because the crack was in a straight line down the pipe, it was believed and ultimately discussed that there was a sudden and unexpected break at the seam of the pipe that was not caused by long term wear and corrosion. While investigating the Pipe Burst, Wolverine learned that just prior to discovering the leak in the maintenance room, the tan yard had simultaneously

spilled two tan mills of wastewater into the drains at the tannery—drains which connected to the Piping System running under the maintenance room at the WWTP. It is believed that the simultaneous spilling of the two tan mill caused a high volume of liquid and pressure in the Piping System and contributed to the liquid wastewater collecting under the maintenance room and releasing through the manhole. As a result of this incident, Wolverine warned against and prohibited tan yard workers from emptying more than one drum at a time going-forward. The precise timing of when the crack in the pipe first occurred remains under investigation but is believed to have occurred prior to 2004. Each of the Sudden and Accidental Releases described herein contributed directly or indirectly to Wolverine's alleged liability in each of the Underlying Actions with respect to each claim of Property Damage, Bodily Injury, and/or Personal Injury—each of which occurred during the period of the Policies sold by Defendants to Wolverine at issue in this Action. This entire event, as described above, will be referred to hereinafter as the "**Pipe Burst.**"

**(i)**    **Clarifier Tank Crack.**  In approximately 2006, Wolverine employees first discovered a visual crack in the clarifier tank at the WWTP resulting in a Sudden and Accidental Releases of various chemicals, liquids, and materials (including, but not limited to, those containing PFAS) into and onto land, air, the atmosphere, and water at the tannery property and into the land and water surrounding the tannery. Prior to 2006, at certain times invluding prior to 1999, the wastewater in the clarifier tank contained Scotchgard, including PFAS. Although there was no liquid or other material visually dripping out of the crack at the time it was initially discovered, when inspected, the dirt underneath the crack in the clarifier tank was saturated from liquid that had escaped through the

25

crack. Once the crack was discovered, Wolverine employees immediately contacted a third-party business that drilled into the crack, put pins in it, and sealed the crack to prevent further discharge. Each of the Sudden and Accidental Releases described herein contributed directly or indirectly to Wolverine's alleged liability in each of the Underlying Actions with respect to each claim of Property Damage, Bodily Injury, and/or Personal Injury. This entire event, as described above, will be referred to hereinafter as the "**Clarifier Tank Crack**."

(j)    **Foam Overflows.**  On several isolated and discrete occasions, foam accidentally, abruptly, suddenly and unexpectedly was blown out of wastewater treatment tanks in the WWTP, "the SOX tanks," resulting in Sudden and Accidental Releases of various chemicals, liquids, and other materials (including, but not limited to, those containing PFAS) onto and into land, air, the atmosphere, and water at the tannery property and onto and into land, air, the atmosphere, and water surrounding the tannery property. The SOX tanks at the WWTP contained liquid wastewater from the tannery and were approximately 15-20 feet tall, and were made up of four-by-eight sheets of expanded steel. The SOX tanks were covered with a lid, which had openings or holes at the tops to permit lab technicians to test and monitor the pH levels of the liquid inside the SOX tanks.  Wolverine's lab technicians were able to extract samples as needed to measure the pH levels of the liquid in the SOX tanks, to ensure the acidity content was not too high.  If the acidity in a SOX tank became elevated, or another unexpected chemical imbalance occurred, foam could form in the SOX tank. On several isolated and discrete occasions, foam formed (containing various chemical and compounds, including PFAS) in the SOX tanks that suddenly and accidentally overflowed and/or was blown

26

out of the SOX tanks onto and into the land, air, the atmosphere, and water at the tannery property and onto and into land, air, atmosphere, and water surrounding the tannery. Because the foam was light, it spread quickly, rapidly, and suddenly through the air and on the ground, traveling at times into the parking lot and elsewhere on the land and water around and beyond the tannery property, causing a quick and accidental discharge of PFAS and other materials into the tannery property and onto third-party property. Wolverine took specific action in response to remediate the foam discharge, and took preventative steps to prevent further incidents. For example, to prevent future events, Wolverine installed sprinklers over the tops of the SOX tanks to prevent the formation and overflow of the foam. Each of the Sudden and Accidental Releases described herein contributed directly or indirectly to Wolverine's alleged liability in each of the Underlying Actions with respect to each claim of Property Damage, Bodily Injury, and/or Personal Injury—each of which occurred during the period of the Policies sold by Defendants to Wolverine at issue in this Action. These events, as described above, will be referred to hereinafter as the "**Foam Overflows.**"

**(k)**     **Drinking Fountain Accident.**     In or about 1999, an isolated and discrete accident occurred at the tannery whereby Scotchgard (which contained PFAS) was accidentally, suddenly, and inadvertently directed into certain water lines connected to a drinking water fountain in the tannery, causing Sudden and Accidental Releases of various chemicals, liquids, and materials (including, but not limited to, those containing PFAS). Because the Sudden and Accidental Release of Scotchgard (containing PFAS) occurred quickly and unexpectedly, before it could be corrected, several Wolverine employees accidentally drank from the water fountain containing which contained Scotchgard

(including PFAS). This Drinking Fountain Accident occurred while Wolverine employees were operating a piece of machinery on a floor above the drinking fountain when the Scotchgard (PFAS) was inadvertently diverted to the drinking fountain. During this work, the employees accidentally and unknowingly diverted Scotchgard into the wrong piping vessel and the backup line failed. Upon discovery that Scotchgard (PFAS) had been mistakenly and suddenly diverted into the drinking fountain in the floor below, Wolverine employees quickly reacted to remediate the accident flushing and cleaning the drinking water lines to remove any presence of Scotchgard (PFAS). Each of the Sudden and Accidental Releases described herein contributed directly or indirectly to Wolverine's alleged liability in each of the Underlying Actions with respect to each claim of Property Damage, Bodily Injury, and/or Personal Injury. This entire event, as described above, will be referred to hereinafter as the "**Drinking Fountain Accident**."

(l)   **The Christmas Flood.**  On or about December 25, 1980, a major wastewater flood occurred in and around the WWTP involving an abrupt and unexpected discharge of wastewater, and resulting in a Sudden and Accidental Release of various chemicals, liquids, and materials (including, but not limited to, those containing PFAS) into and onto land, air, the atmosphere, and water at the tannery property and onto and into land, air, the atmosphere, and water surrounding the tannery property (the "**Christmas Flood**"). After wastewater was treated at the WWTP, a large pipe, which was a fixture of the WWTP, transported the wastewater away from the WWTP and to the City of Grand Rapids.  The pipe allowed for approximately 300 gallons of treated wastewater flow per minute. On or about Christmas Day in 1980, the tannery was not operating at

full capacity and the vast majority of Wolverine employees had time off work for the holiday; nonetheless, some machinery and processes at the WWTP continued to operate during the tannery down time, including the transports of wastewater from the WWTP to the City of Grand Rapids.  While few employees were on-site at the tannery on Christmas Day in 1980, a valve in the WWTP pipe abruptly, suddenly, rapidly, accidentally, and without warning pinched itself closed, causing an aeration tank at the WWTP to suddenly, rapidly, and accidentally overflow. The interior of the WWTP suddenly, accidentally, unexpectedly, and unintentionally flooded with the wastewater (containing PFAS and other chemicals).  As the interior of the WWTP rapidly flooded, the overflow of wastewater quickly grew and suddenly flooded out of the building and reached the exterior of the WWTP at which point the wastewater rushed into Rum Creek and the Rogue River. Once Wolverine became aware of the Christmas Flood, Wolverine took quick action to contain the water (which contained PFAS) and stop the Sudden and Accidental Release that was occurring onto land, air, the atmosphere, and water at the tannery property and onto and into surrounding land, water, and the environment surrounding the tannery property. Also in response to the incident, Wolverine contacted a local bulldozing company that arrived at the scene and dug a moat to retain the remaining wastewater, and placed sand bags around the WWTP to prevent any further release into the surrounding environment. Each of the Sudden and Accidental Releases described herein contributed directly or indirectly to Wolverine's alleged liability in each of the Underlying Actions with respect to each claim of Property Damage, Bodily Injury, and/or Personal Injury—each of which occurred during the period(s) of the Policies sold by Defendants to Wolverine at issue in this

Action. This entire event, as described above, will be referred to hereinafter as the "**Christmas Flood**."

**Wolverine's Historic Waste Disposal Locations:**

In addition to the Sudden and Accidental Releases described in the incidents above, Sudden and Accidental Releases of PFAS occurred from the tannery and each of the disposal sites, including House Street, North Kent Landfill, and Northeast Gravel (now Boulder Creek), and/or potentially from other landfills where Wolverine historically disposed of its waste between 1958 and 1986 (the "Disposal Sites") that allegedly resulted in Property Damage, Bodily Injury, and Personal Injury claims during the period(s) of each of the Insurance Policies issued by the Defendants and at issue in this Action. As part of each of these isolated and discrete events, PFAS accidentally, suddenly, rapidly, and unexpectedly released, escaped, and/or discharged onto and into the land, air, water, atmosphere and environment at each of the Disposal Sites and from each of the Disposal Sites onto and into surrounding land, water, air and atmosphere, distinct from the "overall leaching" of the Disposal Sites.

Prior to transport of any solid waste to any of the Disposal Sites, solid and liquid waste by-product from the tannery was treated at the WWTP. As part of the design and procedure for processing waste at the WWTP, numerous processes were utilized which were designed to prevent and avoid any adverse impact to the environment, including, but not limited to, the following: (1) separation of solid from liquid waste; (2) treatment of solid and liquid waste to ensure absence of hazardous chemicals, compounds, or materials; (3) treatment of solid waste (or "sludge") to ensure there would be no release of any chemicals, compounds, liquids, or other materials known to be present in the sludge at that time; (4) testing and treatment of solid waste and wastewater to ensure compliance with all local, state, and federal permit requirements, rules, laws, and regulation(s)

existing at the time; (5) testing and treating of all solid waste/sludge to minimize the presence of any liquid, including by implementing dewatering technology, to ensure that any liquid in the waste was not accidentally, unintentionally, and unexpectedly released or discharged from the sludge after being placed in the Disposal Site; and (6) other treatments, testing, and processing to prevent and avoid any adverse impact. At all times, including prior to 1986, only solid waste (i.e. sludge) was transported to and deposited at the Disposal Sites. At no time, including prior to 1986, did Wolverine ever knowingly transport or deposit PFAS-containing waste at or into any Disposal Sites—because Wolverine was not aware of the presence of PFAS in its wastewater or sludge and because Wolverine believed that the above-described processes successfully mitigated and/or eliminated any known potentially harmful chemicals, liquids, compounds, or materials from its solid and liquid waste. At all times, including prior to 1986, all solid and liquid waste disposal by Wolverine was performed legally with proper permits and was performed without any knowledge that PFAS (a potentially harmful chemical) was contained within any of its solid waste or wastewater.

Evidence in this Action, to be further demonstrated by Wolverine's experts, will show that PFAS moves and discharges independently of, separately from, and differently than any other chemicals, liquids, materials, or compounds, due to (among other things) its synthetic chemical composition, resulting in a rapid, sudden, abrupt, and quick mobility rate at which it moves into and through the environment, including (among other things) soil, clay, gravel, water and groundwater. The evidence in this Action, to be further demonstrated by Wolverine's experts, will also show how, when, and where PFAS from Wolverine's tannery process discharged suddenly, abruptly, quickly, and accidentally into, from, and out of Wolverine's (and third parties') Disposal Sites as part of discrete and isolated events. These expert opinions will be the subject of future

expert discovery in this Action, and will be based on evidence already available to Defendants; these expert opinions are forthcoming, subject to the schedule set by this Court.

The evidence in this Action, including through expert opinions, will show that PFAS from Scotchgard discharged suddenly, accidentally, unexpectedly, and unintentionally into and from Wolverine's (and third parties') Disposal Sites, causing Property Damage, Bodily Injury, and giving rise to Personal Injury claims during the period(s) of the Insurance Policies issued by Defendants and at issue in this Action.  State, local, and/or federal regulatory authorities specifically approved of Wolverine's waste and waste disposal practices at each of the Disposal Sites at all times while Wolverine was disposing of its waste. At no time while using Scotchgard (which contained PFAS for a period of time through approximately 2000) at the tannery did Wolverine know that Scotchgard contained a potentially harmful chemical, including PFAS. At no point while using Scotchgard containing PFAS at the tannery did Wolverine expect or intend its solid or liquid wastewater from the tannery to contain any significant amount of Scotchard (which contained PFAS). At all times while the tannery was in operation, including from 1958 to 1986, Wolverine intended for any Scotchgard used in the coloring process (or in any other part of the tanner process) to fully adhere to the leather and to not be found in its solid or liquid wastewater, including in the waste deposited at each of the Disposal Sites.

With respect to Wolverine's use of the historic Disposal Sites, at all times, including prior to 1986, each of the Disposal Sites were understood by Wolverine to be "environmentally protective" and would *not* have been reasonably understood to be susceptible to result in present or future environmental harm to third-party property, including groundwater or surface water, due to the release of any chemical, liquid, material, compound, or chemical (including PFAS). Disposal at each of these Disposal Sites especially would not have been expected to cause any kind of harm

harm to third parties, third-party property, or human health (including from PFAS). At all times while Wolverine used each of these Disposal Sites, these Disposal Sites were understood to be legally, properly, and sufficiently designed and maintained to contain any of Wolverine's tannery waste (including PFAS):

- **House Street.** During the period of time when Wolverine disposed of tannery waste—that it later learned contained Scotchgard (including PFAS)—at the House Street location (from approximately 1958 to 1970), several feet of impervious materials separated the lowest deposited waste and the water table (i.e. aquifer)—and this vertical distance between the waste and water table was believed to be (at that time) protective of the groundwater and would not lead to any release of chemical or compounds known to be contained in any of Wolverine's waste. Inspectors visited House Street annually during the 1960s and confirmed that the House Street landfill was continuing to operate in conformity with then-existing laws and regulations and maintained its classification as a sanitary solid waste landfill. It was also understood at all times while in operation that the House Street location was isolated from residential development and associated residential wells.

- **Northeast Gravel Landfill (*now known as Boulder Creek*).** During the period when Wolverine disposed of its tannery waste—that it later learned contained Scotchgard (including PFAS)—at the Northeast Gravel Landfill (between approximately 1970 and 1980), it was a commercial landfill believed to be state of the art at the time and was approved and licensed by the State of Michigan. The Northeast Gravel landfill was, at all relevant times, properly permitted under then-existing laws and regulations,

including more stringent Michigan solid waste regulations that were imposed in the 1980s.

- **North Kent Landfill.** During the period of time when Wolverine disposed of its tannery waste—that it later learned contained Scotchgard (including PFAS)—at North Kent landfill from approximately 1980 to 1985, the landfill was lined, state of the art, and was permitted to accept Wolverine's tannery waste. This landfill was constructed with liners and leachate collection systems and met all Michigan Act 641 requirements. This landfill was inspected regularly and was understood to be fully protective of groundwater.

Any discharge of Wolverine's waste (including PFAS) from each of these Disposal Sites occurred suddenly, rapidly, unexpectedly, unintentionally, and accidently due to discrete, isolated, rapid and accidental releases, and due to unexpected breaks, cracks, and/or rips in the lining(s), and due to the sudden, quick, and rapid movement of PFAS into and out of the contained landfill(s) into and onto the land, water, air, and environment and onto and into third party property land, water, and air where it allegedly caused Property Damage and Bodily Injury and gave rise to Personal Injury claims during the period(s) of each of the Insurance Policies issued by Defendants to Wolverine at issue in this Action. Each of the Sudden and Accidental Releases described herein regarding the Disposal Sites contributed directly or indirectly to Wolverine's alleged liability in each of the Underlying Actions with respect to each claim of Property Damage, Bodily Injury, and/or Personal Injury—each of which occurred during the period of the Policies sold by Defendants to Wolverine at issue in this Action.

Wolverine's investigation is ongoing, as is Phase II fact discovery. Additionally, Phase II expert discovery has not yet commenced in this Action. Accordingly, Wolverine fully reserves its right to supplement this Response as more information becomes available.

3. State the following with respect to each "sudden and accidental" discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquid or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water identified in response to Interrogatory No. 2: (a) when and where the "sudden and accidental" discharge, dispersal, release, or escape took place; (b) the volume and contents of the "sudden and accidental" discharge, dispersal, release or escape; (c) a Description of the purported Property Damage and/or Bodily Injury resulting from such "sudden and accidental" discharge, dispersal, release, or escape; (d) an Identification of any Persons who have knowledge of such "sudden and accidental" discharge, dispersal, release, or escape; (e) an Identification and Description of any Communications regarding such "sudden and accidental" discharge, dispersal, release or escape of Pollutants; and (f) an Identification of any Documents which reference, describe, or relate to such "sudden and accidental" discharge, dispersal, release, or escape.

**RESPONSE:** Wolverine incorporates its General Objections as if stated in full herein. Wolverine incorporates all of its objections and answers stated above in response to Interrogatory Nos. 1 and 2 above, as if stated in full herein. Subject to and without waiving the foregoing objections and General Objections, Wolverine states as follows:

With respect to subsection (a), Wolverine has already stated when and where each sudden and accidental discharge occurred in its response to Interrogatory No. 2, and Wolverine's investigation continues. With respect to subsection (b), Wolverine has already stated the approximate volume and contents of each discharge in its response to Interrogatory No. 2, and Wolverine's investigation continues. Wolverine further states that each Sudden and Accidental Release identified in response to Interrogatory No. 2 contained PFAS (or allegedly contained PFAS), and potentially other chemicals and compounds as well, and each of these Sudden and Accidental Releases allegedly (and directly or indirectly) caused Property Damage and Bodily Injury and gave rise to Personal Injury claims during the period(s) of each of the Insurance Policies

issued by Defendants to Wolverine at issue in this Action. Further, regarding the "volume and contents" of each Sudden and Accidental Release identified herein, Wolverine states as follows with respect to the volume/amount of 3M's PFAS-containing Scotchgard used in the tanning and coloring process:

- In the tannery process, evidence will show that Wolverine only utilized the amount of Scotchgard as was minimally necessary to achieve the water-proofed quality of Wolverine's leather—and not in excess.  In the tannery's lab, the colorists and chemists created formulas for the precise amounts of chemicals (including Scotchgard) needed to achieve the intended coloring and waterproofing of the leather. In particular, Wolverine utilized Scotchgard in the smallest quantity possible, because it was the most expensive chemical purchased by Wolverine. It was common knowledge at Wolverine and amongst the tannery employees that Scotchgard was expensive and should be used as sparingly as possible.  As a result, it was intended that all Scotchgard used in the tanning process would adhere to the leather and not be present, particularly not in any significant amount in the tannery wastewater and solid waste.

- Evidence will show that, because the coloring formulas (and similar processes in which Scotchgard was used) only utilized the minimum amount of Scotchgard possible, the lab would test each batch of leather at the end of the tanning process to ensure that it was sufficiently waterproofed and oil resistant. In furtherance of this goal, the chemists would take a sample of already-treated leather to the lab and drop small amounts of a series of oils onto the leather.  If the oil "held" atop the leather (i.e., did not sink into the leather), the remaining leather in that batch would typically be deemed waterproof.  On the other hand, if the oil did not hold (i.e., sunk into the leather), the lab would test another sample

36

from the batch to ensure that a sufficient amount of Scotchgard was in every piece of leather. If it was determined that there was not enough Scotchgard on the leather, the lab would inform the operators and the material would be treated with additional Scotchgard in the finish department.

- Additionally, during the coloring process, Wolverine's goal was to avoid wasting or discarding any Scotchgard.  For example, employees washed and drained the color mills multiple times before adding Scotchgard, in order to eliminate any excess chemicals that did not affix to the leather.  Once clean, they put 95% Scotchgard and 5% water in the mill, with a "low-float" so that the Scotchgard would remain in the leather (rather than in the liquid)—because, Wolverine at no time intended for any Scotchgard to remain in the liquid at the end of the coloring process. The low-float practice ensured that Wolverine discarded the least amount of Scotchgard possible (if any) with the remaining water.  If any PFAS-containing Scotchgard remained in Wolverine's liquid waste stream following these practices, it was purely accidental and unintended.

In response to subsection (c), Wolverine states that these Sudden and Accidental Releases (including discharges of PFAS from its Disposal Sites, and including but not limited to the discharges identified in Wolverine's Response to Interrogatory No. 2) allegedly resulted in significant volumes of PFAS suddenly, accidentally, unexpectedly, and unintentionally being released into the land, water, air, atmosphere, and environment at the tannery, each of the Disposal Sites and surrounding third-party property. Each of the Sudden and Accidental releases identified herein allegedly contributed individually and collectively to the Property Damage, Bodily Injury, and/or Personal Injury as alleged by each of the plaintiffs in the Underlying Actions—each of which gave rise to an Occurrence under each of the Insurance Policies sold by Defendants to

37

Wolverine at issue in this Action. Further, because the tannery was located adjacent to a public water source (the Rogue River, connected to Rum Creek), any and all Sudden and Accidental Releases occurring at or from the tannery property would have necessarily caused PFAS to reach third-party property, resulting in Property Damage, Bodily Injury, and/or Personal Injury as alleged in the Underlying Actions and during the period(s) of the Defendants' Policies. Additionally, because PFAS moves quickly, suddenly, unexpectedly, and rapidly into, onto,  and through soil, land, water, and groundwater, each and every release of PFAS into and from any of the Disposal Sites was "sudden," because it occurred quickly, without warning, unexpectedly, and abruptly.  It is commonly understood, and evidence in this case will show, that PFAS is pervasive in land, soil, water, groundwater, and the environment because of how rapidly, quickly, and suddenly it moves into and through the environment, including groundwater, particularly as compared to other non-PFAS chemicals, compounds, and materials. The evidence in this case will show *how* and *where* PFAS moves in the environment (referred to as "fate and transport"), and how these Sudden and Accidental Releases described herein contributed to Wolverine's alleged liability for Property Damage, Bodily Injury, and Personal Injury claims in the Underlying Actions during the period of the Policies at issue in this Action.

As such, Wolverine's forthcoming expert reports also will address and be responsive to Your request under subsection (c).

Further, and in response to subsections (d), (e), and (f) of this Interrogatory, and in addition to its Initial Disclosures (including any supplemental responses or amended disclosures), Wolverine has identified the following persons as having or potentially having knowledge of these Sudden and Accidental Releases, and Wolverine has identified any communications and/or documents related to the Sudden and Accidental Releases identified herein, as set forth below:

**The 1965 Tornado and the Train Crash:**

- Among other possible witnesses, former Wolverine employees who were alive during the relevant time period and/or worked at the tannery during the 1960s have or may have knowledge regarding the event, including but not limited to: Steve Lyons, Guy Hayden, Harold Bailey, Madeleine Barrette, Almond Clark, Robert Debusschere, and Bob Winegar. Wolverine's Investigation continues.

- Among other Documents and Communications, Wolverine has identified Plainfield Township Charter meeting minutes from 1965 that recognize the aftermath of the 1965 Tornado, and acknowledge that a tornado caused significant damage in the area during that timeframe.  (UL0054203-UL0054318). Meeting minutes regarding the tornado are dated August 23, 1965, and are signed (and presumably authored by), the Township Clerk, Oliver Hoag (UL0054254); as well as May 3, 1965, also signed by Mr. Hoag, and stating that House Street was being used "to haul tornado debris" (UL0054303). Wolverine also directs you to other publically available information. Investigation is ongoing and Wolverine reserves its right to amend, revise, and/or supplement its Response as new information is obtained, identified, or both, regarding the 1965 Tornado and the Train Crash.

**The Derecho Wind Event, the Dust Bin Fires, and the Dust Container Fire:**

- Among other potential witnesses, former Wolverine employees who were alive during and/or employed at Wolverine during the relevant time period have or may have knowledge of the Derecho Wind Event(s), including but not limited to: Steve Lyons, Guy Hayden, Harold Bailey, Madeleine Barrette, Almond Clark, Robert Debusschere, Bob Winegar, Janice Barnes, Richard Barnum, Cheryl Black, Jerry

Hoffman, Suzanne Johnson, Marty Lihan, and Greg Mills. Wolverine's investigation continues.

- At present, Wolverine is not aware of any Documents or Communications regarding these Sudden and Accidental Releases, other than publically available information. Investigation is ongoing and Wolverine reserves its right to amend, revise, and/or supplement its Response as new information is obtained, identified, or both, regarding the Derecho Wind Event, the Dust Bin Fires, and/or the Dust Container Fire.

**The Sludge Container Spills:**

- Among other potential witnesses, former Bell Pick-Up Truck Driver, Earl Tefft, has or may have knowledge of the Sludge Container Spills.  Former Bell Pick-Up employees, and/or members of the City of Rockford Fire Department that volunteered with or were employed by the Fire Department between 1964 and 1966 may have knowledge of the Sludge Container Spills.  Wolverine's investigation continues.

- Among other Communications and Documents, Wolverine identifies Earl Tefft's deposition transcript as a Document relevant to the Sludge Container spills. Earl Tefft was deposed in the Underlying Actions on June 4, 2019 (UL2595522-2595731) and his deposition transcript from the Underlying Actions, including all exhibits thereto, contains information and/or communications related to the Sludge Container Spills. Wolverine has already produced all deposition transcripts to You from the Underlying Actions.

- Investigation is ongoing and Wolverine reserves its right to amend, revise, and/or supplement its Response as new information is obtained, identified, or both, regarding the Sludge Container Spills.

**The Liquid Wastewater Overflow:**

- Among other potential witnesses, former Wolverine employees who were alive during and/or employed at Wolverine during the relevant time period have or may have knowledge of the Liquid Wastewater Overflow and/or related events, including but not limited to: Steve Lyons, Guy Hayden, Harold Bailey, Madeleine Barrette, Almond Clark, Robert Debusschere, Bob Winegar, Janice Barnes, Richard Barnum, Cheryl Black, Jerry Hoffman, Suzanne Johnson, Marty Lihan, David Huey, and Greg Mills. Wolverine's investigation continues.

- At present, Wolverine is not aware of any Documents or Communications regarding the Liquid Wastewater Overflow. Investigation is ongoing and Wolverine reserves the right to amend, revise, and/or supplement its Response as new information is obtained, identified, or both, regarding the Liquid Wastewater Overflow and/or similar events. Wolverine's investigation continues.

**The Pipe Burst:**

- Among other potential witnesses, former Wolverine employees who were employed at Wolverine during the relevant time period have or may have knowledge of the Pipe Burst and/or related events, including but not limited to: David Huey, Greg Mills, Cheryl Oliver, Joe Azzarello, Richard Barnum, Cheryl Black, and Janice Barnes. Wolverine's investigation continues.

- Among other Documents and Communications, Wolverine identifies David Huey's deposition transcript in the Coverage Action as relevant to the Pipe Burst. David Huey was deposed in this Action on May 19, 2022 and his deposition transcript, including all exhibits thereto, contains information and/or communications related to the Pipe Burst. Wolverine's investigation continues.

- Investigation is ongoing and Wolverine reserves the right to amend, revise, and/or supplement its Response as new information is obtained, identified, or both, regarding the Pipe Burst and/or similar or related events.

**The Clarifier Tank Crack:**

- Among other potential witnesses, former Wolverine employees who were employed at Wolverine during the relevant time period have or may have knowledge of the Clarifier Tank Crack and/or related events, including but not limited to: David Huey, Greg Mills, Cheryl Oliver, Joe Azzarello, Richard Barnum, Cheryl Black, and Janice Barnes. Wolverine's investigation continues.

- Among other Documents on Communications, Wolverine has identified the following Documents and Communications as relevant to the Clarifier Tank Crack: the Rebuttal Report of Eric S. Wood, PHg, LSP at Section 2.3.1, page 9, which discusses a release that "accidentally occurred under the primary clarifier tank at the WWTP"; Wolverine World Wide Inc.'s 2012 Responses to U.S. EPA Requests for Information Pursuant to Section 104 of CERCLA for Wolverine's Former Tannery Site (SSID C593) in Rockford, Michigan Part II, Dated May 18, 2012 (UL0021058–21066). Investigation is ongoing and Wolverine reserves the right to

amend, revise, and/or supplement its Response as new information is obtained, identified, or both.

**Foam Overflows:**

- Among other potential witnesses, former Wolverine employees who were employed at Wolverine during the relevant time period have or may have knowledge of the Foam Overflows and/or related events, including but not limited to: David Huey, Greg Mills, Cheryl Oliver, Joe Azzarello, Richard Barnum, Cheryl Black, Guy Hayden, Rick DeBlasio, Frank Metsaars, Steve Lyons, John O'Brien, and Janice Barnes. Wolverine's investigation continues.

- Among other Documents and Communications, Wolverine has identified the following Documents and Communications related to the Foam Overflows, which are Wolverine's own business records: an April 3, 2001, e-mail correspondence from Cheryl Oliver to Steve Lyons, Calvin Taylor, Frank Metsaars, Guy Hayden, and Janice Barnes, with a carbon copy to Joe Azzarello regarding a "Walk Through" and referencing "foaming overflow" (UL0221637); April 30, 2002 handwritten notes and diagram regarding "SOX overflow" and related correspondence (UL0580826-580830); May 1, 2002 e-mail correspondence from Bryan Rose to Cal Taylor with a carbon copy to Frank Metsaars, Janet Barnes, and Azzarejo regarding "April 30, 2002 Meeting and Site Visit." Investigation is ongoing and Wolverine reserves the right to amend, revise, and/or supplement its Response as new information is obtained, identified, or both.

**Drinking Fountain Accident:**

- Among other potential witnesses, former Wolverine employees who were employed at Wolverine during the relevant time period have or may have knowledge of the Drinking Fountain Accident and/or related events, including but not limited to: David Huey, Greg Mills, Cheryl Oliver, Joe Azzarello, Richard Barnum, Cheryl Black, Guy Hayden, Frank Metsaars, Steve Lyons, and Janice Barnes. Wolverine's investigation continues.

- Among other Documents and Communications, Wolverine identifies Guy Hayden's deposition transcript from the Underlying Actions as a Document relevant to the Drinking Fountain Accident. Guy Hayden was deposed on April 10, 2019 (UL2417966-2418152) and his deposition transcript, including all exhibits thereto, contains information and/or communications relevant to the Drinking Fountain Accident. Steve Lyons was deposed on December 18, 2018 (UL7356934-7357322) and his deposition transcript, including all exhibits thereto, contains information and/or communications relevant to the Drinking Fountain Accident. Wolverine has already produced all deposition transcripts to you from the Underlying Actions. Wolverine's investigation continues.

- Investigation is ongoing and Wolverine reserves the right to amend, revise, and/or supplement its Response as new information is obtained, identified, or both.

**The Christmas Flood.**

- Among other potential witnesses, former Wolverine employees who were alive during and/or employed at Wolverine during the relevant time period have or may have knowledge of the Christmas Flood and/or related events, including but not

44

limited to: Steve Lyons, Guy Hayden, Harold Bailey, Madeleine Barrette, Almond Clark, Robert Debusschere, Bob Winegar, Janice Barnes, Richard Barnum, Cheryl Black, Jerry Hoffman, Suzanne Johnson, Marty Lihan, David Huey, and Greg Mills. Wolverine's investigation continues.

- At present, Wolverine is not aware of any Documents or Communications regarding the Christmas Flood, other than from potentially publically available information. Investigation is ongoing and Wolverine reserves the right to amend, revise, and/or supplement its Response as new information is obtained, identified, or both, regarding the Christmas Flood and/or similar or related events.

**Disposal Sites:**

Wolverine's environmental experts will identify and analyze these and potentially other documents with respect to each of these Disposal Sites, but expert discovery has not yet commenced in Phase II of this Action. Nonetheless, with respect to Sudden and Accidental Releases of PFAS from the Disposal Sites, Wolverine identifies, among others documents (and not limited to), the following communications and/or documents as responsive to this Interrogatory:

- **House Street.** The Michigan Department of Public Health's "Solid Waste Disposal Evaluation Reports" pertaining to the House Street Disposal Area ("Evaluation Reports"). The Department prepared the Evaluation Reports pursuant to the Department's annual inspection of the House Street "facility," during which the Department determined whether the facility "indicate[d] compliance" or "noncompliance" with various factors. These Evaluation Report documents consistently include a "checkmark" approving the House Street Disposal Area's

45

compliance with "protection of ground and surface water." *See, e.g*., August 14, 1969 Evaluation Report (UL0080806); January 19, 1968 Evaluation Report (0010412); April 18, 1966 Evaluation Report (0029100).

- **Northeast Gravel.**   An October 20, 1970 letter from Kent County Health Department (Ettesvold) to Michigan DPH (Hadfield), noting that Wolverine had made contractual arrangements for disposal of waste at Northeast Gravel, a Michigan licensed landfill under Act 87 (UL00029136); A May 2, 1975 letter from the Michigan Department of Natural Resources ("MDNR") to Wolverine, describing disposal at Northeast Gravel: "The isolation of the site was excellent which should provide the greatest protection from possible odors and leachate. . . . The site continues to have our approval[.]."  (UL0542833-UL0542834).

- **North Kent Landfill:** a June 4, 1980 letter from MDNR to Kent County approving disposal of Wolverine sludge at North Kent landfill (UL0427104); November 26, 1980 letter from Plainfield Township to Wolverine approving tannery sludge at North Kent landfill (UL0981506); December 3, 1980 memorandum discussing approval for the tannery waste at North Kent (UL0981505).

Further, and in addition to the documents identified above, Wolverine refers You to the following documents, communications, depositions, and individuals, which, among others contain may contain, possess, or may possess information that is relevant to each Sudden and Accidental Release identified in these Interrogatory Responses, including but not limited to Responses to Interrogatories Nos. 1, 2, and 3 above. These documents demonstrate, among other things, that the Sudden and Accidental Releases of PFAS and/or other chemicals and/or compounds into the

environment were sudden and accidental, and that they were not and could not have been expected or intended by Wolverine:

- All of the Complaints filed in the Underlying Actions. (COM0000001-COM0069435).

- All of Wolverine's Responses to EPA Requests and all documents referenced therein as responsive to the EPA's Requests, including:

  o Wolverine World Wide, Inc.'s 2017 Response to U.S. EPA Requests for Information Pursuant to CERCLA Section 104(e), Dated December 1, 2017

    ▪ Part I, Dated December 1, 2017 (UL0076706–0076734).

    ▪ Part II, Dated December 1, 2017 (UL0076706–0076734).  *See, e.g.* Wolverine's Response to Request No. 22: describing "the methods used to clean up spills of liquid or solid materials during Respondent's operations at the Tannery Site, including but not limited to: a. the types of materials spilled in Respondent's operations; b. the materials used to clean up those spills; c. the methods used to clean up those spills; and d. where the materials used to clean up those spills were disposed of."  Wolverine identified spills including, but not limited to, "soil condition[s] that appeared out of the ordinary," at a "[location] under the Tannery maintenance area where the waste line to the WWTP had broken." (UL0076723–76724). *See also*, Wolverine's Responses to Requests 25 and 26.

  o Wolverine World Wide, Inc.'s 2012 Responses to U.S. EPA Requests for Information Pursuant to Section 104 of CERCLA for Wolverine's Former Tannery Site (SSID C593) in Rockford, Michigan.

    ▪ Part I, Dated April 12, 2012 (UL0016792–16795).

    ▪ Part II, Dated May 18, 2012 (UL0021058–21066). *See e.g.,* Wolverine's Response to Request No. 6: Describing that, during tannery demolition, Wolverine identified "space under the tannery maintenance area where the waste line to the wastewater treatment plant had broken.  The broken line was identified as the source of any soil contamination and materials in the so-called 'pit.'"  Wolverine also identified "soil [at the Site] that had the appearance and odor of tannery waste" potentially due to a crack in the base of the primary clarifier tank at the wastewater treatment plant.  "In addition, during tannery demolition Wolverine's site investigations in the vicinity of

a former boiler also identified a former UST area with minor soil contamination several feet deep with no relevant exposure pathway." *Id.*, Response to Request No. 5

- Deposition transcripts and testimony for the following witnesses and all exhibits marked at each of the depositions (including examples of relevant testimony, as set forth below):

  o **Joe Azzarello,** deposed January 22, 2019 (REF0001271-1398)

  When asked about any problems with "the clarifier tanks at the wastewater treatment plant" during his tenure, Azzarello testified that: "if we had a catastrophic where the whole tank fell down, there would be potential that partially treated liquid in there could spill out in the – certainly in the parking area" and "if it was on the right side, some might get to the river." (321:17–25).  Counsel asked Azzarello: "If there was positive PFAS test at the tannery site, would you be surprised?" (332:23–24).  Azzarello responded: "Probably not.  I mean, you know, if they handled barrels of these equipment for fifty years, I would be surprised if someone didn't run a fork lift tine through one once, or this and that.  ***There's always accidents that happen, or mishaps***.  I can tell you that based on my time there and the way the company operated, ***there was never any intentional releases of that***. Plus, stuff was expensive.  You're not going to dump it down on the floor and that." (333:1–10) (emphasis added) (REF0001350–1355).

  o **Harold Bailey,** deposed October 30, 2018 (REF0001399-0001492)

  o **Janice Barnes,** deposed July 25, 2019 (UL2583236-2583418)

  o **Madeleine Barrette,** deposed November 15, 2018 (UL2405427-2405729)

  o **Cheryl Black,** deposed April 18, 2019 (UL2406974-2407215)

  o **Almond Clark,** deposed November 20, 2018 (UL2412360-2412624)

  o **John Cuthbertson,** deposed July 8, 2021 (UL6751498-6751893)

  o **Fred Finch,** deposed November 27, 2018 (UL2414375-2414570)

  o **Scott French,** deposed June 28, 2019 (UL2589096-2589225)

  o **Guy Hayden,** deposed April 10, 2019 (UL2417966-2418152)

  o **Abigail Hendershott,** deposed May 7-9, 2019; October 12, 2020 (UL6483679-6483882; UL2418153-2418418; UL2418758-2419056; UL2419980-2420430)

- o **David Huey,** deposed May 24, 2019 (UL2422039-2422207)

- o **Steve Lyons,** deposed December 18, 2018 (UL7356934-7357322)

- o **Frank Metsaars,** deposed March 21, 2019 (UL7343159-7343404)

- o **Cheryl Oliver,** deposed December 12, 2019 and January 9, 2019 (REF0001905-2007; UL2597299- 2597482)

- o **Bryan Rose**, deposed March 26-27, 2019 (UL2433433-2433723; UL2434142-2434389)

- o **Karen Vorce,** deposed June 24, 2021 (UL6751108-UL6751497)

- o **Robert Winegar,** deposed November 9, 2019 (UL2443048-2443250)

- o **Mark Westra,** deposed October 17-18, 2019 (UL2601898-UL2602140; UL2601767-2601897)

- o **Mark Worrall,** deposed December 13-14, 2018; September 19-20, 2019 (UL2444176-2444581; UL2595953-2596377; UL2596378-2596649)

These transcripts contain information relevant to Wolverine's claim for coverage under Your Policies and You have an independent duty to investigate, analyze, and evaluate this testimony to look for potential coverage (not defeat it) based on the extensive facts and information provided to You by Wolverine—notwithstanding the relevant information that Wolverine has identified for You herein—particularly in light of the Motion *You* filed insisting that **all** of the deposition transcripts from the Underlying Actions be included as part of the record in this Action.  (*See* ECF No. 231)

- Past and future depositions and testimony of the witnesses in the Coverage Action and all exhibits marked at the depositions (including, but not limited to, examples of testimony, as set forth below):

- o **Guy Hayden,** deposed May 4, 2022

  Hayden testified that he observed sewage from the tannery overflowing from tanks in the disposal plant. (29:1–16).  Hayden testified that the "chemical tanks in the tannery . . . would spring a leak once in a while." (29:18–23).  Defendants asked Hayden: "Do you recall observing sludge overflowing the tanks in the disposal plant?"  Hayden answered: "they overflowed once in a great while at the disposal plant." (30:17–20).  Defendants asked Hayden: "Did you ever see instances where the effluent water didn't go down into the drain – and went someplace else?" Hayden answered: "One time that messed up, they couldn't figure out what was wrong . . . outside contractors took care of that.  It was charted how much it was. What he found was a spider in there going up and down." (37:24–38:16).  Hayden testified that he saw spills and overflows within the tannery itself (71:1); he also testified that overflows occurred at the wastewater treatment plant (71:23).

- o **Gregory Mills,** deposed March 30, 2022

  Mills testified that, among other things, during his tenure at the Tannery, he was aware of several spills during the process whereby liquid and/or solid materials left either the spill tank or the lines leading out to the wastewater treatment plant, and that all such spills were "accidental."  (106:6–25; 107:1–23).

- o **Robert DeBusschere,** deposed June 9, 2022

- o **Abigail Hendershott,** deposed September 24, 2021

- o **David Huey,** deposed May 19, 2022

- o **Frank Metsaars,** deposed May 5, 2022

- o **David O'Donnell,** deposed March 10, 2022

- o **Ismael Rodriguez,** deposed February 16, 2022

- o **Karen Vorce,** deposed January 24, 2022

- o **Robert Winegar,** deposed May 6, 2022

- Past and future reports by Wolverine's Environmental Experts in these Underlying Actions, and future expert reports in this Action, including, but not limited to, the following: (1) *McNaughton et al. v. Wolverine World Wide, Inc. et al*., Case No. 18-00086-CZ (Kent Cty. Cir. Ct.) ("*McNaughton*"); (2) *Kapp v. Wolverine World Wide, Inc., et al*.,

Case No. 18-08616-NI (Kent Cty. Cir. Ct.) ("*Kapp*"); (3) *Zimmerman v. 3M Co., et al.*, Case No. 1-17-cv-1062 (W.D. Mi.) ("*Zimmerman*"); (4) *Debski et al., c. Wolverine World Wide Inc., et al.*, Case No. 18-00055-CZ, (Kent Cty. Cir. Ct.) ("*Debski*"); (5) *Hula v. Wolverine World Wide, Inc., et al.*, Case No. 18-00055-CZ) ("*Hula*"); and (6) *Brimmer, et.al., v. Wolverine World Wide, Inc., et al.*, Case No. 18-01136-CZ (Kent Cty. Cir. Ct.) ("*Brimmer*").  For example, the expert reports of Allen Reilly, Marcia Williams, and David Woodward provide key details regarding the timelines, locations, and nature of Wolverine's operations.

Wolverine further responds that its experts' forthcoming reports in this Coverage Action will contain information relevant to: Wolverine's claim for coverage under Your Policies; Sudden and Accidental Releases; and Wolverine's operations—each of which may be responsive to this Interrogatory.

- Wolverine's Responses to Written Discovery in the Underlying Actions, including, but not limited to, the following:

  o Responses to Defendant 3M Company's First Set Of Requests For The Production of Documents and Interrogatories (Aug. 12, 2019) (*Nylaan*).  (UL2257399-2257569);

  o Responses To Plaintiffs' First Request For Production Of Documents (Nov. 21, 2018) (*Klekotka*).  (UL2263798-2263825);

  o Responses To Plaintiffs' First Request For Production Of Documents (Nov. 21, 2018) (*Moen*).  (UL2263016-2263043); and

  o Third Amended Responses to Plaintiffs' First Set of Interrogatories and Requests for Production (May 18, 2018) (*Nylaan*). (UL567008-567065).

- Information available at this web page: U.S. ENVIRONMENTAL PROTECTION AGENCY, EPA IN MICHIGAN, "Wolverine World Wide Tannery, EPA and EGLE on Cleanup of

Contamination," https://www.epa.gov/mi/wolverine-world-wide-tannery (last accessed January 21, 2023); including, but not limited to, the following documents linked there:

- o The Administrative Settlement Agreement and Order;

- o Sampling Data; EPA PFAS Method 537 Validated Results from Wolverine, Michigan;

- o All Documents in the Searchable Documents Collection, which includes the Unilateral Administrative Order.

- Information available at this web page: MICHIGAN.GOV MICHIGAN PFAS ACTION RESPONSE TEAM, "PFAS Sites and Areas of Interest – Rockford Tannery, (Rockford, Kent County)," https://www.michigan.gov/pfasresponse/investigations/sites-aoi/kent-county/rockford-tannery (last accessed January 21, 2023), including all documents linked there.

- Information available at this web page: MICHIGAN.GOV MICHIGAN PFAS ACTION RESPONSE TEAM, "PFAS Sites and Areas of Interest – House Street Disposal Area Documents, Presentations, and Recordings," https://www.michigan.gov/pfasresponse/investigations/sites-aoi/kent-county/house-street-disposal-area/documents (last accessed January 21, 2023), including all documents linked there.

- Environmental Expert Eric Wood's Phase I Rebuttal Report and the Deposition of Eric Wood in this Action.

- Documents and correspondence related to the Sole Plant Claim and produced to you in this Action, which includes:  (a) the EGLE Compliance Communication Regarding the Release at the Former Wolverine Sole Plant located at 485 Wolverine drive, NE, Rockford, Michigan (COR0018145-18176) and (b) the Sole Plant Work Plan prepared by Rose &

Westra, a Division of GZA (COR0018177-18185) (the Work Plan"). The Work Plan states that "there is no known source of PFAS" at the Sole Plant location, "and this evaluation is in the preliminary stages." *Id*.

Wolverine's investigation is ongoing, as is Phase II fact discovery. Additionally, Phase II expert discovery has not yet commenced in this Action. Accordingly, Wolverine fully reserves its right to produce additional documents and supplement this Response as more information becomes available.

Dated: January 27, 2023

*s/ Kevin B. Dreher*
Kevin B. Dreher
BARNES & THORNBURG LLP
1 N Wacker Drive, 44th Floor
Chicago, IL  60606-7507
Telephone: (312) 214-8308
Facsimile: (312) 207-6400
Kevin.Dreher@btlaw.com

Charles M. Denton
BARNES & THORNBURG LLP
171 Monroe Ave. NW, Suite 1000
Grand Rapids, MI 49503
Telephone: (616) 742-3930
Charles.Denton@btlaw.com

*Counsel for Wolverine World Wide, Inc., f/k/a Wolverine Shoe & Tanning Corporation*

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

WOLVERINE WORLD WIDE, INC.,

      Plaintiff,

v.                                                        Case No. 1:19-cv-00010-JTN-SJB

THE AMERICAN INSURANCE COMPANY,   Hon. Janet T. Neff
et al.,                                                   Mag. Judge Sally J. Berens
                                    Special Master Paula Manderfield

      Defendants.

---

## CERTIFICATE OF SERVICE

I, Kevin B. Dreher, an attorney, certify that on January 27, 2023, a true and correct copy of **Plaintiff Wolverine World Wide, Inc.'s Objections and Responses to Certain Defendants' Third Set of Phase II Interrogatories** was served upon counsel for Defendants via electronic mail, and that this certificate of service was filed with the Clerk of Court using the electronic court filing system, which will send notification of such filing to all Counsel of Record.

                                            *s/ Kevin B. Dreher*_____
                                            Kevin B. Dreher